IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MHS HOLDING ONE, INC. f/k/a MCCLELLAND HOME HEALTH PHARMACY, INC., <br><br> Plaintiff, <br><br> v. <br><br> MHHP ACQUISITION COMPANY LLC and OMNICARE, INC., <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )   C.A. NO. 06-292-GMS <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION TO STRIKE ATTORNEYS' FEE CLAIM**

Plaintiff MHS Holding One, Inc. f/k/a McClelland Home Health Pharmacy, Inc. ("MHS") hereby opposes the Defendants' Motion to Strike Attorneys' Fee Claim (the "Motion"). As grounds for this Opposition, MHS states as follows.

1. The requests for relief in MHS's Complaint state in relevant part that MHS "respectfully requests that this Court: . . . Award costs and reasonable attorneys' fees." (Complaint, Request for Relief (d)). MHS's Complaint further states in relevant part that the Court, "Grant such other relief as this Court deems just and appropriate." (Complaint, Request for Relief (e)).

2. It is within this Court's discretion to award attorneys' fees to a party pursuant to Delaware law. "Delaware follows the 'American Rule,' whereby a prevailing party is generally expected to pay its own attorney's fees and costs." Montgomery Cellular Holding Co. v. Dobler, 880 A.2d 206, 227 (Del. 2005). The Delaware Courts,

however, have recognized several exceptions to the American Rule by which attorneys' fees can be awarded, including the exception for "bad faith" conduct during the litigation. Montgomery, 880 A. 2d at 227; Johnston v. Arbitrium (Cayman Is.) Handels AG, 720 A.2d 542, 545 (Del. 1998). The purpose of the bad faith exception to the American Rule is to deter abusive litigation in the future, thereby avoiding harassment and protecting the integrity of the judicial process. Kaung v. Cole National Corp., 884 A.2d 500, 506 (Del. 2005). In their Motion, the defendants failed to state that exceptions to the American Rule permit Courts applying Delaware law to award attorneys' fees.

   3. The Delaware Courts have indeed awarded attorneys' fees to litigants pursuant to Delaware law. E.g., Kaung, 884 A.2d at 507 (Court upheld bad faith exception to American Rule and awarded attorneys' fees for, among other things, making excessive and duplicative deposition requests and for a witness refusing to answer questions in a deposition.); RGC International Investors, LDC v. Greka Energy Corporation, 2001 WL 984689 (Del. Ch. Aug. 22, 2001) (Court of Chancery awarded attorneys' fees under bad faith exception because defendant advanced multiple theories having minimal grounding in fact and law and thereby made litigation more expensive than it should have been.) (attached hereto as Exhibit A); Johnston, 720 A.2d at 546 (Court held fee-shifting award of attorneys' fees was appropriate under the bad faith exception because defendants had defended the action despite their knowledge that they had no valid defense, delayed the litigation, asserted frivolous motions, falsified evidence, and changed their testimony to suit their needs.).

4.     It would be inappropriate, and at a minimum, premature to strike MHS's request for relief relating to awarding reasonable attorneys' fees. As the litigation progresses, it is possible that factual developments or misconduct could occur that may merit an award of attorneys' fees pursuant to the bad faith exception to the American Rule, as recognized by Delaware law. By its request for relief, MHS merely reserves the right to request an award of attorneys' fees should circumstances warrant. Accordingly, MHS's request for relief is consistent with Delaware law, proper and should not be stricken.

WHEREFORE, MHS respectfully requests that Defendants' Motion to Strike Attorneys' Fee Claim be denied.

ASHBY & GEDDES

*/s/ Tiffany Geyer Lydon*

Philip Trainer, Jr. (I.D #2788)
Tiffany Geyer Lydon (I.D. #3950)
222 Delaware Avenue, 17th Floor
P. O. Box 1150
Wilmington, DE  19899
(302) 654-1888
(302) 654-2067 (Facsimile)
ptrainer@ashby-geddes.com
tlydon@ashby-geddes.com

Dennis J. Kelly
Paul R. Mastrocola
Burns & Levinson LLP
125 Summer Street
Boston, Massachusetts 02110
(617) 345-3000
(617) 345-3299 (Facsimile)

Dated:  June 26, 2006
170780.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 26th day of June, 2006, the attached **PLAINTIFF'S**

**OPPOSITION TO DEFENDANTS' MOTION TO STRIKE ATTORNEYS' FEE CLAIM**

was served upon the below-named counsel of record at the address and in the manner indicated:

Philip A. Rovner, Esquire                                    <u>HAND DELIVERY</u>
Potter Anderson & Corroon LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19899

Thomas C. Dearing, Esquire                                 <u>VIA FEDERAL EXPRESS</u>
Bethany V. Crawley, Esquire
Fowler White Boggs Banker, P.A.
50 N. Laura Street, Suite 2200
Jacksonville, FL  32202


                                            /s/ *Tiffany Geyer Lydon*
                                            _____
                                            Tiffany Geyer Lydon

169962.1

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 984689 (Del.Ch.), 27 Del. J. Corp. L. 955
(Cite as: Not Reported in A.2d)

H

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
RGC INTERNATIONAL INVESTORS, LDC
Plaintiff,
v.
GREKA ENERGY CORPORATION, Saba
Petroleum Company f/k/a HVI Acquisition
Corporation, Randeep S. Grewal, William N. Hagler,
Dr. Charles A. Kohlhaas, Alex S. Cathcart and Dr.
Jan F. Holtrop, Defendants.
No. CIV.A.17674.

Submitted: July 12, 2001.
Decided: Aug. 22, 2001.

Martin S. Lessner, C. Barr Flinn, and John J.
Paschetto, Esquires, of Young Conaway Stargatt &
Taylor, Wilmington, Delaware; of Counsel: Michael
R. Klein, Robert F. Hoyt, and Christopher A. Wilber,
Esquires, of Wilmer, Cutler & Pickering,
Washington, D.C., Attorneys for Plaintiff.
Edward P. Welch, Edward B. Micheletti, Lorin M.
Hochman, Esquires, of Skadden, Arps, Slate,
Meagher & Flom, Wilmington, Delaware; of
Counsel: Marco E. Schnabl, William J. Hine, and
William J. O'Brien, III and Mark Lebovitch,
Esquires, of Skadden, Arps, Slate, Meagher & Flom,
New York, New York; Attorneys for Defendants
Greka Energy Corporation, Saba Petroleum
Company, Randeep S. Grewal, William N. Hagler,
Alex S. Cathcart and Dr. Jan F. Holtrop.
Dr. Charles A. Kohlhaas, Pro Se Defendant.

MEMORANDUM OPINION
STRINE, Vice Chancellor.
*1 Plaintiff RGC International Investors, LDC
("RGC") brings this action against defendants Greka
Energy Corporation ("Greka"), Saba Petroleum
Corporation ("New Saba"), and certain individual
defendants affiliated with Greka.[FN1] The dispute
between these parties centers around the purchase by
Greka (through an acquisition subsidiary, HVI
Acquisition Corporation ("HVAC")) of the former
Saba Petroleum Corporation ("Old Saba") in a March
22, 1999 merger (the "Merger").

FN1. These individual defendants are
Randeep S. Grewal, William N. Hagler, Dr.
Charles A. Kohlhaas, Alex S. Cathcart, and
Dr. Jan F. Holtrop. To simplify matters
slightly, I typically refer to Greka when I am
referring to the arguments presented by all
of the defendants.

Before the Merger, RGC owned "Series A Preferred"
stock in Old Saba with certain enumerated rights
including a right of redemption. As all of the parties
clearly understood at the time, the Merger could not
proceed unless some agreement was reached as to the
fate of the Series A Preferred stock. To address this
issue, Greka, Old Saba, and RGC negotiated and
executed on March 15, 1999 a detailed term sheet
(the "Term Sheet") that contemplated a transaction
(the "Note Exchange") through which the Series A
Preferred shares would be exchanged for a
convertible debt instrument (the "Note") from Greka.
The Note Exchange was conditioned on final,
definitive documentation and the successful closing
of the Merger.

In the Term Sheet, the parties stated their mutual
agreement to negotiate in good faith and in an
expedited manner towards the Note Exchange.
Although the Merger closed a week after the signing
of the Term Sheet, approximately nine months passed
without an agreement on the definitive
documentation of the Note Exchange. RGC filed this
lawsuit, having lost faith in its negotiating adversary
to reach a final agreement to consummate the Note
Exchange.

In a prior opinion, this court granted a motion by the
defendants to dismiss all claims presented by RGC
that were based on the contractual and other rights
RGC possessed before the Merger. But, in that same
opinion, this court concluded:
RGC's complaint states a claim for breach of the
Term Sheet and for relief under the doctrine of
promissory estoppel (collectively, the "Term Sheet
Claims"). It is clear that RGC and Greka materially
altered their positions in reliance upon the accord
outlined in the Term Sheet. As a result, this litigation
must focus on the legal consequences of that
agreement and the parties' subsequent conduct under
it.[FN2]

Not Reported in A.2d                                                                                           Page 2
Not Reported in A.2d, 2001 WL 984689 (Del.Ch.), 27 Del. J. Corp. L. 955
**(Cite as: Not Reported in A.2d)**

FN2. *RGC International Investors, LDC v. Greka Energy Corp.,* Del. Ch., mem. op. at 1-2, Strine, V.C. (November 6, 2000) (footnote omitted) ("*Greka I* "). This lawsuit also produced a subsequent opinion that dismissed counterclaims arising from the allegation that RGC engaged in a purposeful plan to drive down the market price of Old Saba's stock through a pattern of short-selling transactions. *See RGC International Investors, LDC v. Greka Energy Corp.,* Del. Ch., mem. op., Strine, V.C. (March 7, 2001, corrected March 13, 2001) ("*Greka II* ").

In this opinion, following a full trial on the merits, I conclude that Greka was responsible for the breakdown in the negotiations between the parties following the signing of the Term Sheet. The parties signed the Term Sheet, a thoroughly negotiated, detailed document that included a compromise reached by the parties on the issue of RGC's short-selling of Greka securities. One week after the signing of the Term Sheet, Greka closed the Merger, a very profitable transaction from its perspective. Thereafter, Greka purposefully and persistently ignored the obligations it had assumed under the Term Sheet. Specifically, Greka attempted to renegotiate the previously agreed to issue concerning short selling and simply ignored any obligation to reach on an expedited basis a final agreement regarding the Note Exchange. Based on these acts of bad faith, I conclude that the plaintiffs are not only entitled to damages of $12,507,203.17 (including prejudgment interest), but all their reasonably incurred attorneys' fees as well.

## I. *The Parties*

**\*2** Plaintiff RGC is a Cayman Islands limited duration company that owned 7,310 Series A Preferred shares of Old Saba before Old Saba was merged out of existence. Old Saba was an energy company involved in the acquisition, exploration, and development of oil and gas properties throughout the world.

Defendant Greka is also an energy company that uses a proprietary horizontal drilling technology to maximize production of established oil and gas reservoirs.

Defendant New Saba is a subsidiary of Greka formerly known as HVAC before the Merger. HVAC

took the "Saba" name after merging with Old Saba even though HVAC, and not Old Saba, was the surviving corporation in the Merger.

Defendant Randeep S. Grewal was at all relevant times Greka's Chairman of the Board, Chief Executive Officer ("CEO"), and controlling shareholder. On October 8, 1998, Grewal assumed a directorship of Old Saba. As of the time of the Merger, Grewal had become the Chairman and CEO of Old Saba as well. Since the Merger, Grewal has served as Chairman and CEO of New Saba in addition to his responsibilities with Greka.

The remaining defendants, Messrs. Hagler and Cathcart and Drs. Kohlhaas and Holtrop, were directors of Old Saba at the time of the Merger.

## II. *Factual Background*

The court's previous decision in *Greka I* extensively described the events leading up to and including the negotiation of the Term Sheet. As noted above, *Greka I* indicated that the subsequent litigation, most notably, the trial, must focus on the legal consequences of the Term Sheet and the parties' conduct under it.[FN3] To the extent the events before the negotiation of the Term Sheet are relevant and necessary for the purposes of this opinion, they are related briefly below. The facts relating to the negotiation, execution, and subsequent breach of the Term Sheet, as developed at the trial, are described more thoroughly.

FN3. *Greka I,* mem. op. at 1-2.

## A. *RGC Invests In Old Saba*

On December 31, 1997, RGC purchased 10,000 shares of the newly created Series A Preferred stock from Old Saba for $10,000,000 pursuant to a Securities Purchase Agreement ("SPA").[FN4] Also on that day, Old Saba filed a Certificate of Designations as an amendment to its certificate of incorporation, outlining in detail the features and rights attaching to the Series A Preferred shares. RGC also had certain rights under a Registration Rights Agreement entered into on that same day.

FN4. Before the events at issue in this lawsuit, Old Saba redeemed 2,000 of the Series A Preferred shares in exchange for

Not Reported in A.2d                                                                                    Page 3
Not Reported in A.2d, 2001 WL 984689 (Del.Ch.), 27 Del. J. Corp. L. 955
(Cite as: Not Reported in A.2d)

$2,150,000. Thus, for purposes of the events at issue in this dispute, RGC owned 8,000 Series A Preferred shares. These 8,000 Series A shares represented all of the shares of that series of Old Saba stock.

### B. RGC's Rights as a Holder of the Series A Preferred Shares

The SPA and the Certificate of Designations specified a number of rights and protections belonging to Old Saba's Series A Preferred shares. These rights had important implications with regard to any potential acquisition of Old Saba.

First, the Certificate of Designations required Old Saba to redeem the Series A Preferred shares at a formula-fixed price at the option of RGC in the event that Old Saba failed to obtain timely effectiveness with the Securities and Exchange Commission (the "SEC") of the Registration Statement for the Series A Preferred shares (the "Mandatory Redemption Provision").[FN5] Old Saba did not obtain the required SEC approval within the required time. Thus, during the period of negotiations that eventually led to the Term Sheet, RGC had the right to demand consideration from Old Saba in accordance with the formula provided in the Mandatory Redemption Provision.

FN5. Cert. of Desig. Art. V.A(ii).

*3 Second, the Certificate of Designations contained a provision that provided the Series A Preferred shares with certain rights in the event of a merger. Foremost among these rights, the Series A Preferred shares would possess the same rights, including the Mandatory Redemption Provision rights (adjusted for the Merger conversion ratio) against the acquiring entity as it did against Old Saba.

Third, under the SPA, so long as RGC held the Series A Preferred shares, Old Saba was barred from consummating a merger unless the surviving corporation in the merger: i) assumed the obligations Old Saba owed to RGC under the Certificate of Designations and the Securities Purchase Agreement; and ii) was "a publicly traded corporation whose Common Stock is listed for trading on the Nasdaq, Nasdaq SmallCap, NYSE, or AMEX."[FN6]

FN6. Securities Purchase Agreement § 4(j).

### C. The Financial Condition of Old Saba Before the Merger

By the middle of 1998, Old Saba was struggling financially. According to the proxy statement filed in connection with the Merger (the "Proxy Statement"), Old Saba then had a working capital deficit of nearly $30,000,000 and was in default on $20,000,000 of its $30,500,000 debt.[FN7] Among its debts, Old Saba was having a particularly difficult time meeting its obligations to Bank One, the company's first secured creditor which held a security interest of $26,000,000 in Old Saba. Old Saba's stock price had plummeted to approximately $1-2 per share. Old Saba's auditors had issued warnings questioning the company's ability to continue as a going concern.[FN8] Adding to these problems, the American Stock Exchange was considering delisting Old Saba.

FN7. Proxy Statement at 20, 26.

FN8. Id. at 20.

### D. Greka Begins Discussions with RGC to Acquire Old Saba

In the fall of 1998, Greka began talks with Old Saba about a merger between Old Saba and Greka's wholly-owned acquisition subsidiary, HVAC. A possible acquisition made sense to Greka due to the potentially complementary relationship between Greka's horizontal drilling technology and Old Saba's assets such as its existing oil fields. Greka recognized, however, that due to the existence of the Series A Preferred shares, it must negotiate with RGC if Greka was to acquire Old Saba.

During this period, as Grewal testified, he told RGC that he wanted to pursue a bankruptcy transaction. Specifically, Grewal stated at trial that Old Saba was "a bankrupt company that is an ideal bankruptcy case and what I would like to do is put it through 11, clean it up, as I have before, and bring it out without any baggage attached to it."[FN9] According to Grewal, RGC represented to him over drinks at the Four Seasons hotel in New York that if Greka performed an equity transaction as opposed to a bankruptcy transaction, RGC would waive penalties that had accrued under the rights held by the Series A Preferred shares and would not engage in short sales of Greka common stock.[FN10] Without commenting specifically on the veracity of this recounting, I note that there is no testamentary or documentary evidence that corroborates this account. Rather, as

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                    Page 4
Not Reported in A.2d, 2001 WL 984689 (Del.Ch.), 27 Del. J. Corp. L. 955
(Cite as: Not Reported in A.2d)

will be detailed below, the parties later entered into a Term Sheet agreement that specifically dealt with the issues that supposedly were discussed at the Four Seasons meeting, but that agreement in no way evidences the positions that either Grewal or RGC allegedly represented at the Four Seasons meeting.

> FN9. Grewal Tr. 738. (Trial testimony is herein cited as "[witness] Tr. ___.") As revealed by questioning by opposing counsel, Grewal's "expertise" and "experience" in putting companies through bankruptcy proceedings were not as extensive as his comments seem to imply. To put it bluntly, Grewal's supposed expertise purchasing companies out of bankruptcy and bringing them to health has not been demonstrated. *See* Grewal Tr. 880-83.

> FN10. Grewal Tr. 735-40, 747-57.

*4 On October 5, 1998, Greka reached an initial accommodation with RGC, which at that time already possessed the right to trigger a Mandatory Redemption of the Series A Preferred shares.[FN11] The accord between RGC and Greka (the "Option Agreement") involved: (1) the purchase by Greka of 690 of RGC's 8,000 Series A Preferred shares for $750,000; (2) the granting to Greka of an exclusive option to purchase up to 6,310 of the remaining Series A Preferred shares for nearly $6.9 million through November 5, 1998, with the right to extend that option for another month for $500,000; and, (3) agreement between the parties to a formula by which Greka could buy out the remaining 1,000 Series A Preferred shares held by RGC. In the event that Greka actually exercised its option, RGC agreed to waive its rights under the Mandatory Redemption Provision.

> FN11. The real world value of the Mandatory Redemption right was, of course, severely limited by Old Saba's financial difficulties.

Having agreed to the Option Agreement with RGC, Greka soon reached an accord with Old Saba on October 8, 1998 (the "Common Stock Purchase Agreement") to purchase 2,500,000 newly issued Old Saba common shares by December 4, 1998. At the time of the signing of the Common Stock Purchase Agreement, Grewal was added to the Old Saba board.

As to the possibility of placing Old Saba into bankruptcy, I also note that there is no evidence that Old Saba's then controlling stockholder and Chairman of the Board, Ilyas Chaudhary, was prepared to put the company into Chapter 11 so that Grewal could pick it up on the cheap. If Grewal wanted a deal in any certain time frame, he had to address Chaudhury's interests. Indeed, Grewal did deal directly with Chaudhary and had Greka purchase nearly 3,000,000 Old Saba shares (approximating 29% of Old Saba's then outstanding common stock) from Chaudhary in November, 1998 at a substantial premium to market. This purchase increased Greka's ownership to 34.7% of outstanding Old Saba common stock. After that point, Greka could only "purchase" Old Saba out of bankruptcy if it washed out its *own* equity stake and opened itself to competition from other bidders.[FN12]

> FN12. Grewal, in his testimony, seemed to believe he could, as a control person, put Old Saba through a bankruptcy proceeding in which all equity holders, other than Greka, would lose their stake and from which Old Saba would emerge with less debt and Greka in firm control. *See* Grewal Tr. 897-900. This fantastic scenario would, I believe, be illegal under several legal theories, including the Delaware law of fiduciary duty.

### E. *Greka Fails to Complete the Purchases Contemplated by the Option Agreement But Secures an Agreement to Merge with Old Saba*

As of December 6, 1998, Greka had not exercised its option to purchase the second installment of 6,310 Series A Preferred shares pursuant to the Option Agreement. On December 7, 1998-the day after Greka's Option Agreement with RGC expired-Greka and Old Saba announced that they had reached an agreement whereby Old Saba would merge with HVAC in a stock-for-stock merger.

On December 18, 1998, Old Saba, Greka, and HVAC officially entered into an Agreement and Plan of Merger (the "Merger Agreement") and announced their intention to submit the transaction for shareholder approval. The Merger Agreement, as amended, provided for a fixed consideration of 1,240,000 shares of Greka to be paid to Old Saba's common shareholders. At the same time, Greka and Old Saba indicated that negotiations with RGC would

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 984689 (Del.Ch.), 27 Del. J. Corp. L. 955
(Cite as: Not Reported in A.2d)

be commenced to extend Greka's now-expired Option Agreement with RGC or to reach another accommodation with RGC regarding the Series A Preferred shares.

**\*5** In recognition of RGC's rights, the Merger Agreement provided:

*Provisions for the Series A Convertible Preferred Stock.* Prior to the Effective Time, [Greka] shall have notified each Holder of Series A Convertible shares of [Old] Saba ... of the provisions it has made for the conversion of said Saba Preferred Shares into Common of [Greka] in accordance with the Saba Preferred Shares designation.[FN13]

> FN13. Merger Agreement § 2.1(f) (emphasis added).

### F. *RGC and Greka Negotiate the Term Sheet*

After the issuance of the Proxy Statement on February 19, 1999, RGC and Greka began the negotiations that would lead to the Term Sheet. The parties were clearly running short on time as the stockholder votes on the Merger were set for March 19, 1999, and the Merger was to close the second business day after a successful vote.[FN14]

> FN14. Merger Agreement at I-2; Proxy Statement at 37. *See* Grewal Tr. 33-34 (Greka "definitely [felt] under the gun.").

On February 25, 1999, Greka sent RGC a written proposal offering to exchange RGC's Series A Preferred shares for Greka preferred shares and a promise that RGC would not engage in any activity involving Greka stock, including short or long sales.[FN15] After some discussion between the parties, RGC rejected the proposed exchange and explained in detail why RGC could not accept the proposed restrictions on its short selling.[FN16] RGC then took that opportunity to propose that Greka provide RGC with a secured convertible note that could be structured to give Greka a defined period of time to buy out the Series A Preferred shares using cash.[FN17] RGC also proposed that the note could be converted into common stock of Greka before the note became due subject to certain agreed upon limitations. RGC sent a draft term sheet to Greka on March 3, 1999.[FN18] During this period, Old Saba's problems mounted as Bank One initiated foreclosure proceedings against the company.

> FN15. Joint Exhibit 11.

> FN16. *See* Stahlecker Tr. 47-53; Davidson Tr. 347-48.

> FN17. *See* Stahlecker Tr. 53-54; Davidson Tr. 361, 539-40.

> FN18. Joint Exhibit 12.

In negotiating the Term Sheet, the parties extensively discussed several important issues including the scope of RGC's market activity in Greka stock. Of particular concern, the parties focused on RGC's ability to engage in short selling. Greka insisted on a flat prohibition of short sales which, it argued, had undermined the value of Old Saba stock in the past. RGC asserted that it needed to engage in short sales in order to protect its investment in the secured *convertible* note. That is, RGC wanted through short selling to hedge its risk against receiving a large amount of Greka stock.

### G. *The Term Sheet*

On March 15, 1999, four days before the stockholder meeting, RGC, Old Saba, and Greka reached agreement on the detailed Term Sheet. The transaction contemplated therein, the Note Exchange, would require RGC to exchange all of its Series A Preferred shares for a Secured Convertible Note issued by Greka. The Note was to have a value equal to the "aggregate Stated Value of the Series A Preferred Stock owned by RGC plus *all* accrued and unpaid interest, dividends and registration payments up to the closing date of the exchange."[FN19] Greka agreed to pledge all of its collateral assets to secure the Note (the "Security Provision").[FN20] As testified to at trial, Greka was not "thrilled" with this provision.[FN21]

> FN19. Term Sheet, at 1 (emphasis added). Although the Term Sheet does not precisely define the closing date, it appears that even Grewal expected the Note Exchange to close within a few weeks of the signing of the Term Sheet. *See* Grewal Tr. 639.

> FN20. Term Sheet, at 2. The Security Provision states, "The Note shall be secured by all of the collateral (broadly defined) of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                           Page 6
Not Reported in A.2d, 2001 WL 984689 (Del.Ch.), 27 Del. J. Corp. L. 955
(Cite as: Not Reported in A.2d)

[Greka]."

FN21. Davidson Tr. 363-64.

*6 The Term Sheet also states that the directors, officers, and principal shareholders of Greka would enter into lock-up agreements "prohibiting sales (including margin sales), transfers or other dispositions (including pledges)" of Greka stock while the Note is outstanding (the "Lock-Up Provision"). FN22 The Term Sheet includes provisions concerning the exchange of warrants held by RGC in Old Saba for warrants to purchase shares of Greka stock. Greka agreed as well to file a Form S-3 Registration Statement within twenty days of the closing of the Note Exchange that would cover enough shares to satisfy the possible conversion of the Note and the exercise of the warrants to purchase Greka stock. Additionally, Greka and New Saba agreed "to reimburse RGC for expenses reasonably incurred in connection with the [Note Exchange], including, without limitation, reasonable expenses for attorneys." FN23

FN22. Term Sheet, at 3.

FN23. Term Sheet, at 4.

The Term Sheet provided that the Note was due to be paid in cash 180 days after the closing date (the "Due Date") for 120% of "the then outstanding principal amount thereof, plus *all* accrued and unpaid interest thereon." FN24 Greka had the right to prepay at any time prior to the Due Date any portion of the Note "at 104% of the principal amount being prepaid plus accrued interest thereon." FN25 If Greka prepaid a portion of the Note equal to "(i) the original principal amount of the Note, less (ii) an amount equal to the sum of (A) $500,000, plus (B) the aggregate amount of the registration payments included in the original principal amount of the Note, the balance of the Note shall be forgiven." FN26 Put simply, if Greka paid approximately $7,000,000 within 180 days, nothing more would be due under the Note.

FN24. Term Sheet, at 1 (emphasis added).

FN25. Term Sheet, at 1.

FN26. Term Sheet, at 1-2.

After much discussion, the parties agreed on a compromise regarding market activity by RGC in

Greka stock; RGC agreed not to engage in any activity in Greka stock during the 30-day period in which the conversion price on the Note was to be established. FN27 The Term Sheet also contains a "Conversion Limitations" section that according to Grewal worked with the initial 30-day market activity prohibition to act as "a practical method of eliminating or deincentivizing one wanting to hedge their positions [sic] through a short sale." FN28 The "Conversion Limitations" paragraph states that:

FN27. Term Sheet, at 2.

FN28. Grewal Tr. 807.

During each 30 day period following the Closing Date (each such period being referred to as a "Conversion Period"), RGC shall be entitled to convert up to a portion of the principal amount of the Note equal to the greater of (i) 20% of the original principal amount thereof and (ii) 20% of the aggregate trading volume of the Common Stock during the 30 trading days ending on the trading day immediately preceding the Conversion Period for which the calculation is being determined. Such amounts shall accumulate each month so that by the 5th month these conversion limitations shall no longer be applicable. The cumulative amount of the Note which is convertible pursuant to the preceding sentences shall be reduced by [Greka] prior to the date of any such conversion. FN29

FN29. Term Sheet, at 2.

*7 Greka contends that this provision effectively allows Greka to prevent "(by paying cash to RGC) any shares of Greka ever coming into the hands of RGC if [RGC] tried to convert to cover its short sales." FN30

FN30. Defs.' Post-Trial Br., at 12.

According to the Term Sheet, the closing of the Note Exchange was subject to certain conditions, including: (1) "[m]utual agreement on definitive documentation," (2) "completion of the merger between [Old] Saba and [Greka]," and (3) "cancellation of the [Series A] Preferred Stock owned by [Greka]." FN31 The parties expressly *acknowledge[d] their mutual agreement to the above terms [of the Term Sheet] and their intention to negotiate in good faith the contemplated*

Not Reported in A.2d                                                                    Page 7
Not Reported in A.2d, 2001 WL 984689 (Del.Ch.), 27 Del. J. Corp. L. 955
**(Cite as: Not Reported in A.2d)**

*transaction in an expedited manner.*" [FN32]

> FN31. Term Sheet, at 3-4.

> FN32. Term Sheet, at 4 (emphasis added).

### H. *The Merger Closes While Little Progress Is Made Regarding the Note Exchange*

In keeping with the parties' agreement to agree to definitive documentation in an expedited manner, RGC circulated a draft set of Note Exchange documents to Greka and Old Saba on March 19, 1999. Collectively over ninety pages in length, these draft documents were quite extensive and caught Greka by surprise. [FN33] Greka was immediately concerned as well by the content of these draft documents. [FN34] Although I would characterize this initial set of draft documents as a bit aggressive, they were not commercially unreasonable in view of the fact that the parties had agreed on a convertible note, and not a more straightforward definitive cash buy-out. In particular, I note that *none* of RGC's proposals contradicted a specific provision of the Term Sheet. [FN35] Rather, RGC's first set of draft documents reflected the Term Sheet and supplemented it with implementing provisions.

> FN33. Grewal Tr. 641-42, 644; Davidson Tr. 401-04.

> FN34. Grewal Tr. 640; Davidson Tr. 440.

> FN35. At trial, even Greka's lawyer could not recall any terms in the draft documents that were contrary to any provisions in the Term Sheet. *See* Davidson Tr. 406.

On March 22, 1999, the defendants filed the certificate of merger with the Secretary of State's office and the Merger consideration was paid out without any comments on the draft documents having yet been made by Greka or Old Saba. [FN36] RGC assumed that Greka would review the draft documents and return comments quickly. When this did not happen by March 22, RGC attempted to call Greka's counsel, Roger Davidson of the law firm Ballard Spahr Andrews & Ingersoll, LLP to find out the cause of the delay. On March 24, 1999, the Merger closed with RGC having received no comments on the draft definitive documents. RGC was shocked that the Merger had closed without the Term Sheet deal closing contemporaneously. [FN37]

> FN36. As filed, the certificate of merger made no provision for the Series A Preferred. Instead, the certificate of merger simply referenced the Merger Agreement, which had only indicated that the Series A Preferred would be informed of how their shares were being converted. Likewise, the certificate of incorporation of the surviving corporation in the Merger, HVAC, which had changed its name to New Saba, made no provision for RGC's Series A Preferred.

> FN37. Stahlecker Tr. 113; Marlowe Tr. 313. RGC had expected the Note Exchange and the Merger to close simultaneously. *See* Stahlecker Tr. 70-75; Marlowe Tr. 307-08.

### I. *After the Closing of the Merger, Negotiations Over the Note Exchange Break Down*

The negotiations continued when on March 30, 1999, RGC at last received comments to its proposed documents eleven days after they were sent, and six days after the closing of the Merger. RGC's frustration grew after receiving the comments which they described as "a lazy markup." [FN38] Davidson contends that this first mark-up was "lazy only in the sense it wasn't accompanied by a detailed description of why I had [made certain changes] except for comments in the margin." [FN39] The defendants contend that this markup was "a perfectly appropriate attempt to keep the negotiations moving forward (by making the obvious and most easily implemented changes first) in light of [RGC's attempt] to foist one-sided documents on Greka at the eleventh hour." [FN40] In any case, RGC responded with a slightly revised draft set of documents on April 9, 1999.

> FN38. Stahlecker Tr. 117; *see also* Marlowe Tr. 912-14.

> FN39. Davidson Tr. 569.

> FN40. Defs.' Post-Trial Br., at 17.

*8 Greka finally responded with detailed, substantive comments to the documents on April 20, 1999, approximately one month after the initial draft documents were sent. This set of comments raised issues that had not previously been raised in Davidson's March 30 mark-up, including objections to the form of the documents themselves, short

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 984689 (Del.Ch.), 27 Del. J. Corp. L. 955
(Cite as: Not Reported in A.2d)

selling covenants, and transferability restrictions. RGC promptly replied in detail to Greka's letter on April 22, 1999. Greka countered fourteen days later with its May 6, 1999 five-point letter (the "Deal Killer Letter").

In the Deal Killer Letter, Greka listed five items that it considered absolutely critical if any final agreement was to be reached between the parties. The five items concerned: (1) the non-negotiability/non-assignability of the Note; (2) what representations and warranties would be made by Greka as to New Saba's business; (3) Greka's obligation to prepay the Note from asset sales not producing cash; (4) the ability of RGC to engage in market transactions, including short sales of Greka stock; and (5) a confessed judgment provision. The parties made substantial progress in negotiating three of these issues, numbers (1), (2), and (3).[FN41] Even point (5) did not seem likely to terminate the negotiation. Gerald Stahlecker of RGC testified that RGC offered that the confession would only apply at the time of the maturity of the note. According to Stahlecker, although Grewal initially rejected this attempt at compromise, leaving the confessed judgment provision "as an open issue, ... it wasn't going to hold up the transaction."[FN42] But the parties made no progress on RGC's right to engage in short selling. Both parties agree that the real sticking point in the negotiations over the definitive documentation was point (4), the short selling provision.[FN43]

FN41. As to the non-negotiability/non-assignability of the Note, the parties reached a compromise that Grewal found "reasonable" whereby RGC would give Greka a right of first refusal to buy the Note should a third party offer to buy the Note from RGC. See Stahlecker Tr. 135-36; Marlowe Tr. 942-43. On the requested representations and warranties, the parties apparently agreed to "carve-out" or schedule those items to which Greka objected. See Stahlecker Tr. 138-39; Marlowe Tr. 962. Similarly, the parties appeared to have reached a compromise on the prepayment question; 50% of all proceeds that came in the form of cash or marketable securities would have to be paid to RGC. See Stahlecker Tr. 140, Marlow Tr. 955-56; Davidson Tr. 595-96; Grewal Tr. 833-34.

FN42. This point was apparently never actually communicated to Grewal.

Stahlecker Tr. 283-86; see also Marlowe Tr. 966. In any event, given Grewal's behavior, it was hardly unreasonable for RGC to want an easy method of collection in the event Greka breached a clear obligation to pay.

FN43. See February 27, 2001 Oral Argument Tr. at 65. Greka's counsel stated to the court, "Everyone agrees the deal killer was RGC's refusal to give a representation about short selling and our client's insistence that they do so."

The testimony at trial demonstrates that Greka conditioned its agreement to definitive documentation and the completion of the Note Exchange on RGC's agreement not to engage in any market activity in Greka stock, including short selling.[FN44] RGC asserted that Greka was attempting to renegotiate a point that had already been negotiated at length and settled in the Term Sheet. [FN45] RGC therefore refused to renegotiate this point.[FN46] This disagreement over short selling effectively eliminated any chance that the parties would execute definitive documentation and perform the Note Exchange. As a result, RGC began to review with counsel its rights under the Series A Preferred and the Term Sheet.

FN44. See Grewal Tr. 625-630.

FN45. See Stahlecker Tr. 142-46, 229-30; Marlowe Tr. 974-78.

FN46. Id.

During this period when negotiations appeared to be at a standstill, Grewal orally assured RGC that Greka would pay pursuant to the Term Sheet by September 30, 1999.[FN47] In exchange, RGC agreed to hold off on exercising its redemption rights until that date. In a later conversation, Grewal promised that although Greka would not be able to pay RGC as of the end of September, RGC would be paid pursuant to the Term Sheet by November 30, 1999.[FN48] November 30, 1999 came and went without redemption by Greka. Contrary to the testimony of Greka's own attorney, Davidson, Grewal flatly denies having committed Greka to pay RGC a specified amount by a particular date.[FN49] I do not credit Grewal's denial. I believe he led RGC on, in hopes he could put pressure on them to settle on terms that would give Greka a windfall at RGC's expense.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 984689 (Del.Ch.), 27 Del. J. Corp. L. 955
(Cite as: Not Reported in A.2d)

FN47. *See* Stahlecker 148-50; *see also* Davidson Tr. 462 (recounting a conversation in which Grewal told Davidson that Greka had promised to pay $7,000,000 to RGC by September 30, 1999).

FN48. *See* Stahlecker Tr. 151-54; Marlowe Tr. 982-84; Kaminsky Tr. 1075-79.

FN49. Defs.' Post-Trial Br., at 28.

*9 On December 1, 1999, RGC attempted to exercise its Mandatory Redemption rights under the Certificate of Designations by seeking to collect over $26,000,000 based on the assumption that the redemption price would be based on Greka's and not New Saba's stock trading price. On December 9, 1999, Greka refused to honor this redemption notice. As a result, RGC brought this lawsuit on December 15, 1999.

### III. *The Parties' Contentions*

This litigation has already produced two opinions that dispensed of eight of the nine claims asserted by RGC and all of Greka's counterclaims.[FN50] In this post-trial opinion, the Court is therefore left with the central question described in *Greka I.* That is, the Court must determine the consequences flowing from Term Sheet and the parties' subsequent conduct under it.[FN51]

FN50. *See Greka I,* mem. op. at 45; *Greka II,* mem. op at 32.

FN51. *Greka I,* mem. op. at 1-2.

RGC argues that Greka breached the Term Sheet in bad faith by conditioning any agreement to definitive documentation and the consummation of the Note Exchange on the prohibition of RGC from engaging in short sales of Greka stock. RGC bases its assertion of bad faith on the fact that the Term Sheet plainly dealt with the short selling issue. RGC argues that Greka knew it had compromised on this point before the closing of the Merger and understood that in attempting to renegotiate this point, it was in effect purposefully scuttling any possibility of final agreement between the parties now that the Merger had successfully closed. The plaintiffs also point to Greka's failure to negotiate after the signing of the Term Sheet in an expedited manner as an independent breach of its obligations under the Term Sheet. Alternatively, RGC argues that it is entitled to damages under the doctrine of promissory estoppel.[FN52]

FN52. As another alternative, RGC contends that the substantive economic provisions of the Term Sheet are specific enough to bind Greka to be ordered by the court to comply with them, regardless of whose conduct caused the parties not consummate the Note Exchange. For reasons identified *infra* at pages 36-38, I do not reach this issue.

RGC therefore asks this Court for damages and a security interest in Greka equal to the amount Greka would have owed RGC had Greka given RGC the Note as specified by the Term Sheet. RGC further urges this Court to award it prejudgment interest at a rate several points higher than Greka's cost of capital or the legal rate, to specifically enforce the Lock-Up Provision, and to grant it attorneys' fees reasonably incurred in this litigation.

Greka asserts that RGC has not met its burden of proving that Greka breached its obligations in bad faith. Greka also argues that the Term Sheet is unenforceable as to its substantive terms under the doctrine of promissory estoppel. As to a possible remedy, Greka urges the Court to use its equitable powers, if necessary, to create a remedy based on the value of RGC's investment in Old Saba at the time of the Merger. That is, Greka maintains that RGC may only be entitled to reliance, not expectancy, damages. Greka further contends that RGC is in no way entitled to the enforcement of the Security or Lock-Up Provisions. Greka also argues against any right of RGC to receive attorneys' fees.

### IV. *Analysis Of Claims*

#### A. *Greka Breached Its Obligations Under the Term Sheet in Bad Faith*

*10 The parties agree that the Term Sheet "once executed, gave rise to an enforceable obligation on the part of the signatories to negotiate in good faith the definitive documentation required to give effect to the terms of the transaction described therein." [FN53] The evidence presented at trial demonstrates that Greka breached this obligation.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                Page 10
Not Reported in A.2d, 2001 WL 984689 (Del.Ch.), 27 Del. J. Corp. L. 955
(Cite as: Not Reported in A.2d)

FN53. *Greka I,* mem. op. at 33; Pl.'s Opening Post-Trial Br., at 35; Defs.' Post-Trial Br., at 29.

The evidence is clear that the parties extensively negotiated RGC's right to engage in transactions involving Greka securities, specifically including short sales of Greka stock. The earliest written communication concerning what would grow into the Term Sheet, the written proposal from Greka dated February 25, 1999, conditioned a potential exchange of the Series A Preferred stock for preferred stock in Greka on RGC's agreement not to engage in any transactions in Greka securities, including short sales, during any period of time. [FN54] RGC's immediate response was outright rejection of this provision. [FN55] The negotiations progressed towards an exchange of the Series A Preferred shares for a convertible secured debt instrument. [FN56] Greka explicitly informed Greka that it would not agree to language prohibiting transactions involving Greka securities. [FN57]

FN54. Joint Exhibit 11, ¶ 3.

FN55. *See* Stahlecker Tr. 50-51; Davidson Tr. 346-51.

FN56. Stahlecker Tr. 54-56; Davidson Tr. 347-48.

FN57. Stahlecker Tr. 55.

On March 3, 1999, RGC sent Greka the first draft of what would eventually become the signed Term Sheet. Negotiations concerning any short selling prohibition continued to be pivotal to both RGC and Greka. [FN58] The positions of the parties could not have been clearer. RGC "[was] not going to agree to any limitations on [RGC's] ability to conduct sales, whether they be long or short, so long as those sales [were] conducted in compliance with applicable securities laws." [FN59] Greka would not do a deal unless RGC was prohibited from transactions in Greka securities. [FN60] There is no disagreement that: (i) the parties clearly represented their views to each other on this issue, (ii) each party understood the other's position on this issue, (iii) this was a central issue in the negotiations over the Term Sheet, and (iv) this issue had to be addressed if the parties were to agree to sign the Term Sheet.

FN58. Stahlecker Tr. 56-62; Davidson Tr.

355-59.

FN59. Stahlecker Tr. 57.

FN60. Davidson Tr. 358.

The negotiation over the short selling prohibition was intense. The parties ultimately resolved this issue with an agreement that RGC would not engage in any activity in Greka stock during the 30-day period in which the conversion price of the Note was to be established. [FN61] This compromise was then incorporated into the next draft, dated March 8, 1999, of what would become the Term Sheet. This language remained unchanged in the final executed Term Sheet of March 15, 1999. [FN62] The battle over short selling had been fought and concluded (so RGC reasonably believed) upon the signing of the Term Sheet. [FN63] Even Greka's principal attorney, Mr. Davidson, agreed that the Term Sheet "laid to rest the issue of RGC's trading in Greka's stock." [FN64]

FN61. Stahlecker Tr. 61; Davidson Tr. 358-59.

FN62. Term Sheet, at 2 (stating, specifically, "RGC will agree not to engage in any transaction in the Common Stock prior to the 31st trading day immediately following the Closing Date.").

FN63. Davidson Tr. 358-59.

FN64. Davidson Tr. 359.

After the signing of the Term Sheet and the closing of the Merger, and about one month after RGC sent to Greka the first set of proposed definitive documents, Greka responded on April 20, 1999, at last, with a detailed list of objections. Included among these new objections, Greka demanded that the parties "add a representation and warranty of RGC stating that it will not interfere with the trading markets for Greka Common Stock." [FN65] RGC immediately responded on April 22, 1999, that the scope of RGC's activity in Greka stock had already been negotiated and agreed to in the Term Sheet.

FN65. Joint Exhibit 28, at 4.

**\*11** The May 6, 1999 Deal Killer Letter reiterated Greka's insistence on renegotiating the short selling prohibition. This time, however, Greka stated that

Not Reported in A.2d                                                                                  Page 11
Not Reported in A.2d, 2001 WL 984689 (Del.Ch.), 27 Del. J. Corp. L. 955
(Cite as: Not Reported in A.2d)

unless RGC agreed not to trade in Greka stock, there would be no deal. In fact, although there were five "deal-killer" points, the short selling issue was the pivotal issue that prevented any possibility of an agreement. As described above, Greka's objections concerning the non-negotiability/non-assignability of the Note, the representations and warranties to be made by Greka as to New Saba's business, and Greka's requirement to prepay the Note from asset sales not producing cash were or would have been resolved. The parties even progressed on the confessed judgment provision.

Following the Deal Killer Letter, Greka left little doubt that unless RGC reapproached the short selling issue, Greka would never complete the Note Exchange or enter into any definitive documents. According to the testimony of Greka's CEO, Grewal:
Question: It was your position that under no circumstances was Greka going to agree to definitive documentation proposed by RGC, because Greka could never agree to permit short sales by RGC; correct?
Grewal: From a short selling standpoint, yes.[FN66]

> FN66. Grewal Tr. 628. *See also* Grewal Tr. 625-26:
> Q: Now, in negotiating the definitive documentation in May of 1999, Greka's position on the short selling activities was that it did not want RGC and Greka securities at all and that it was a deal killer if RGC did not agree to that; is that correct?
> A: Didn't want them a thousand miles close to our stock, that's right.
> Q: It was a deal killer if RGC didn't agree to that?
> A: If they didn't come and agree to stop short selling the stock, that was not something I would agree to, yes.
> Q: Under no circumstances was Greka going to agree to definitive documentation proposed by RGC, because you would never agree to permit short sales by RGC in the market for Greka; correct?
> A: I did not want them to short [Greka] stock, that's right.

A finding of "bad faith" is necessarily a fact-intensive inquiry.[FN67] Here, the chain of events begins with the negotiation of the Term Sheet, moves through the signing of the Term Sheet, and concludes with the breakdown in negotiations following the

signing of the Term Sheet and the closing of a profitable Merger. Together, these events paint a rather clear picture. RGC and Greka engaged in a thorough negotiation over the vital short selling issue. The parties compromised on that issue and included this compromise in the signed Term Sheet. Following the signing of the Term Sheet and the closing of the Merger, Greka attempted not only to renegotiate the short selling issue, but conditioned the transaction contemplated by the Term Sheet on this renegotiation.

> FN67. *Abex Inc. v. Koll Real Estate Group, Inc.,* Del. Ch., C.A, 13462, mem. op. at 37, Jacobs, V.C. (Dec. 22, 1994).

Greka makes two arguments in defense of its attempt to renegotiate the short selling rights of RGC. First, Greka argues that the Term Sheet, contrary to RGC's assertions, actually gave Greka complete control over the ability of RGC to trade in Greka securities. Greka contends that the Term Sheet contains "a multi-pronged conversion mechanism."[FN68] After the initial 30-day period during which RGC could not engage in market activity in Greka stock and the conversion price became fixed, the "Conversion Limitations" section of the Term Sheet, according to Greka, (i) "restricted the amount of Greka stock that RGC could receive in conversion in any 30 day period thereafter to 20% of the Note"; and (ii) "gave Greka the right to prevent any Greka conversion shares from coming into RGC's hands by paying cash to RGC equal to the amount RGC wished to convert." [FN69] Greka therefore asserts that this carefully crafted provision effectively gave it control over any ability of RGC to engage in a "hedging strategy" because Greka had the absolute right to substitute cash for any shares of common stock that RGC might have used to cover its short sales.

> FN68. Defs.' Post-Trial Br., at 39.

> FN69. *Id.*

**\*12** This attempt to recast the Term Sheet fails for several reasons. First and most obvious, if Greka actually believed in the effectiveness of the multi-pronged conversion mechanism, Greka had no good faith reason to insist on a specific covenant from RGC in the subsequent negotiations that RGC engage in no short sales, mush less describe the lack of such a covenant as a "deal killer." Greka argues that a short selling representation would represent nothing

Not Reported in A.2d                                                                                                              Page 12
Not Reported in A.2d, 2001 WL 984689 (Del.Ch.), 27 Del. J. Corp. L. 955
(Cite as: Not Reported in A.2d)

more than "asking to memorialize, in concrete terms, the control it believed it already possessed." [FN70] This need to "memorialize" what Greka argues that it had already achieved in the Term Sheet negotiation is puzzling to say the least. This argument presented by Greka is particularly baffling considering that the negotiations broke down as a result of this need to "memorialize" a set of provisions to which the parties had previously agreed.

FN70. Defs.' Post-Trial Br., at 40.

Moreover, even assuming that the conversion mechanism acted just as Greka portrays it, RGC still maintained control over its ability to hedge its risk through short selling and still ultimately end up with its desired goal, cash, not Greka stock. [FN71] Greka only retained the right to pay cash, instead of shares of Greka common, should RGC choose to convert according to the prescribed limitations. This is not a prohibition on RGC's right to sell Greka stock short. Further, by the fifth month following the initial 30 day period, the conversion limitations would no longer apply because the 20% per month conversion limitation would accumulate after each month. After five months (plus the initial 30 day period) therefore, RGC could convert all of the Note without a volume limitation. Not coincidentally, the Note was to be due six months after the closing, the same date as the expiration of all the conversion limitations. At the end of six months, either Greka would have prepaid the Note in cash or the Note would be due, payable in cash (assuming RGC did not convert the entire Note). This provision is structured to leave RGC with cash in exchange for the Series A Preferred, not to prevent short selling. [FN72]

FN71. In support of this conclusion concerning RGC's goal in negotiating the Term Sheet, the court notes that RGC pushed for a transaction that would convert the Series A Preferred into a debt obligation (the Note) instead of into preferred shares of Greka as Greka initially suggested, and that RGC agreed to the generous prepayment option only if Greka would pay cash to extinguish the Series A Preferred.

FN72. At oral argument, Greka's counsel tried to argue that Grewal was acting in good faith because he intended to pre-pay the Note promptly and thereby avoid RGC *ever* owning Greka stock. Counsel conceded

a major flaw in his argument though: Grewal never offered to sign a note committing Greka to pay off the Note immediately for cash. Instead, Grewal simply had that option. *See* July 12, 2001 Oral Argument Tr., at 44-45, 66-69. Given Grewal's past behavior under the earlier Option Agreement which was extended without a purchase of RGC's position by Greka, RGC had no basis or duty to trust that Grewal would cause Greka to pre-pay. In the end, counsel's creative attempt to justify Grewal's actions simply reinforces the blatant bad faith with which Grewal acted. Having consummated the Merger, Grewal's goal was simple: try to put off RGC as long as possible until RGC would settle on the cheap.

Second, Greka contends that the discussions between Greka and RGC before the Term Sheet were consistent with Greka's negotiating position that RGC could not engage in the short selling of Greka stock. Greka urges the Court to place tremendous reliance on the meeting between the parties at the Four Seasons that occurred months before the negotiation of the Term Sheet. The Court chooses not to do that for several reasons. First, there is no documentary or testimonial evidence corroborating what Grewal asserts was said at this short meeting over gin and tonics, and I do not credit his version. More importantly though, the parties, months later, engaged in thorough negotiations over the short selling provision where each party clearly understood the other party's position on the short selling issue. There is no way that Greka did not understand that RGC absolutely required the ability to trade in Greka stock. The Term Sheet itself explicitly dealt with this issue as negotiated by the parties. At the time of the signing of the Term Sheet, Greka understood that it had reached a compromise on the short selling issue *no matter what was discussed at the Four Seasons meeting months earlier.* There is no evidence of the alleged Four Seasons accord in the Term Sheet. [FN73] Regardless of what was said at the Four Seasons, the Term Sheet itself is the clearest expression of the parties' respective positions on the short selling issue. Suffice it to say, the Court is unpersuaded by either attempt by Greka to justify its actions during the negotiations following the signing of the Term Sheet.

FN73. Indeed, the Option Agreement agreed to in October 1998 only contains a brief reference to short selling. *See* Option

Not Reported in A.2d                                                          Page 13
Not Reported in A.2d, 2001 WL 984689 (Del.Ch.), 27 Del. J. Corp. L. 955
(Cite as: Not Reported in A.2d)

Agreement, at 3 ("RGC agrees that, following the later to occur of (i) the Shareholder Approval Date [when the shareholders of Old Saba vote to approve the issuance of common shares pursuant to the conversion of the Series A Preferred shares] and (ii) the Effective Date [when the SEC declares the effectiveness of a Form S-1 covering the resale of the shares underlying the Series A Preferred], it will use its commercially reasonable efforts to unwind the Short Position [of 653,000 shares of Old Saba common stock].").

**\*13** Under the well-established precedent of this Court, to constitute bad faith, actions by a defendant "must rise to a high level of egregiousness." [FN74] "Actions by a defendant which necessitate judicial intervention to secure a clearly defined and established right" and "actions by a defendant designed to force an opposing party to resort to litigation for the purpose of causing unreasonable delay" are both evidence of bad faith. [FN75] Grewal's conduct clearly meets this standard.

FN74. *Judge v. City of Rehoboth Beach,* Del. Ch., C.A. 1613, mem. op. at 4, Chandler, V.C. (April 29, 1994).

FN75. *Abex,* mem. op. at 37.

The attempt here to condition any further progress towards the Note Exchange on a previously contested and compromised point was an unambiguous act of bad faith in breach of the obligations Greka agreed to in the Term Sheet. The appearance of Greka's behavior is worsened by the fact that Grewal clearly understood exactly what he was doing in attempting to renegotiate the short selling compromise. Grewal agreed that Greka's position regarding short selling expressed in the Deal Killer letter "was the absolute same position that Greka had articulated to RGC during the negotiations for the Term Sheet." [FN76] When asked if language prohibiting RGC from trading in Greka securities was not in the Term Sheet because RGC would not agree to such language, Grewal responded:

FN76. Grewal Tr. 631.

[The Term Sheet] and every line item detail negotiations [that] were not administered by me personally. So why's it not in there? I'm not happy that it's not in there, that obviously means they didn't agree to it. I mean, that is something I don't like, but that's life. [FN77]

FN77. Grewal Tr. 632-33.

This determination of bad faith is buttressed by Greka's failure to negotiate definitive documentation in an expedited manner. This obligation was also expressly agreed to in the Term Sheet. [FN78] Nevertheless, from the moment the parties signed the Term Sheet, the record contains no evidence that supports the contention that Greka attempted to negotiate the Note Exchange on an expedited basis. Instead, the record evidences RGC's expedited efforts to reach a final agreement on the Note Exchange, which were frustrated by Greka's lack of urgency. In particular, I note that RGC provided draft definitive documentation to Greka on March 19, 1999, four days after the signing of the Term Sheet, and five days before the closing of the Merger, but did not receive a thorough response from RGC until just over one month later. The court is mindful that Greka and its counsel was involved in transactions on several fronts, notably in regards to Old Saba's creditors and the Merger. Nevertheless, Greka obligated itself to negotiate the Note Exchange with RGC on an expedited basis and clearly breached that obligation.

FN78. Term Sheet, at 4.

To conclude this section, I note that the parties have engaged in a somewhat confusing debate about whether the Term Sheet is a contract that is enforceable as to its substantive terms, irrespective of the reasons for the parties' failure to reach a final accord on the Note Exchange. I see no reason to enter into this quagmire, which emerges as relevant only if the parties' failure to consummate the Note Exchange did not result from either party's breach of its duty to negotiate in a good faith, expedited manner. Given the highly detailed nature of the Term Sheet, the important commercial circumstances in which it was negotiated, and the fact that the Term Sheet appears in all respects to be a binding contract as to certain promises, I have no difficulty concluding that the Term Sheet gave rise to an enforceable obligation on Greka's part to negotiate in good faith on an expedited basis. Regardless of whether Greka had reserved to itself the right not to consummate the Note Exchange if the parties failed to reach accord on documentation based on a point not covered in the Term Sheet, it had clearly not reserved the right to

Not Reported in A.2d                                                Page 14
Not Reported in A.2d, 2001 WL 984689 (Del.Ch.), 27 Del. J. Corp. L. 955
**(Cite as: Not Reported in A.2d)**

thwart final agreement by insisting that RGC abandon specific provisions of the Term Sheet.[FN79]

> FN79. This is one of several reasons why this case is distinguishable from *Transamerican Steamship Corp. v. Murphy,* Del. Ch., C.A. No. 10511, let. op., Allen, C. (Feb. 14, 1989). *Transamerican* involved an alleged *oral* understanding between two parties trying to settle an ongoing litigation on certain terms. The court held that the supposed oral understanding did not create an enforceable contract because one party had expressly stated that, "there is no deal until there's a signed agreement" and the parties never reduced their agreement to a signed writing. *Id.,* let. op. at 6. Here, although the Term Sheet includes conditions that must be met before the consummation of the Note Exchange including "mutual agreement on definitive documentation," the Term Sheet does not include language that the parties explicitly reserved the right not to be bound. Rather, these two sophisticated, commercial parties "acknowledge[d] their mutual agreement" to the terms of the approximately three-and-a-half page, singe-spaced Term Sheet. These material terms that would form the basis of the Note Exchange included agreements as to price, duration, interest, prepayment, conversion, security, and registration rights. The facts of this case therefore are more closely analogous to those of *Asten v. Wangner Sys. Corp.,* Del. Ch., C.A. 15617, Steele, V.C. (Sept. 23, 1999) (granting specific performance of a written settlement agreement that did not omit any material terms but left the negotiation of certain implementing terms to the future); *Hazen v. Miller,* Del. Ch., C.A. No. 1292, let. op., Jacobs, V.C. (Nov. 18, 1991) (noting that an agreement to make a contract may be specifically enforced if that agreement contains all of the material and essential terms to be incorporated into the final contract, and if those terms are definite and certain).

**\*14** As noted previously, the parties even went so far as to state in the Term Sheet that "[t]he parties hereby acknowledge their mutual agreement to the above terms." [FN80] At the very least, after signing the Term Sheet, neither party could in good faith insist on

specific terms that directly contradicted a specific provision found in the Term Sheet. In insisting on a renegotiation of RGC's right to engage in short selling, this is exactly what Greka did. Even the defendants admit that they are culpable if their own bad faith breach was the proximate cause of the parties' failure to agree on final documentation.[FN81] I have so found, and have concluded that this bad faith involved a blatant attempt to force RGC to give up a specifically negotiated provision in the Term Sheet-a provision that was already a settled item.

> FN80. Term Sheet, at 4.

> FN81. *See* July 12, 2001 Oral Argument, at 47-48.

### B. *In The Alternative, RGC Is Entitled To Damages Under The Doctrine Of Promissory Estoppel*

Thus, I have concluded that Greka breached its duty to negotiate the Note Exchange in good faith in an expedited manner. As a result, RGC is entitled to relief for injury caused by this breach. In the alternative, RGC contends it is entitled to damages under the doctrine of promissory estoppel. As noted in *Greka I,* a plaintiff may obtain relief under this doctrine where:

i) a promise was made;

ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee;

iii) the promisee reasonably relied on the promise and took action to his detriment; and

iv) such promise is binding because injustice can be avoided only by enforcement of the promise.[FN82]

> FN82. *Greka I,* mem. op. at 34 (citing *Lord v. Souder,* Del.Supr., 748 A.2d 393, 399 (2000)).

The elements of promissory estoppel have been met here. As noted in *Greka I,* RGC refrained from exercising its Mandatory Redemption Rights or Conversion Rights before the Merger because it reasonably relied to its detriment on the promises contained in the Term Sheet. Greka entered into the Term Sheet knowing that without it, the profitable Merger with Old Saba could not have been consummated in the manner it was. After the Merger closed, the Note Exchange contemplated by the Term Sheet did not occur. Although Greka received all of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                        Page 15
Not Reported in A.2d, 2001 WL 984689 (Del.Ch.), 27 Del. J. Corp. L. 955
(Cite as: Not Reported in A.2d)

its intended consideration that followed from the Term Sheet, namely the closing of the Merger and the resulting financial rewards that accrued to Greka, RGC received nothing.[FN83] Thus, RGC was subjected to the type of injustice the doctrine of promissory estoppel is intended to prevent.

> FN83. RGC had agreed to accompany Greka to the end of the rainbow, only to discover that Greka had taken the pot of gold for itself.

## V. Damages

### A. *RGC Should Receive Its "Expectation Interest"*

For the reasons discussed above, Greka has been found in breach of its obligation to negotiate in good faith *and* liable under the doctrine of promissory estoppel. The question has therefore become not whether RGC is entitled to a remedy, but what the appropriate nature of that remedy should be. In anticipation of this dilemma, the parties have hotly contested the nature of the remedy to be awarded to RGC. RGC argues that it is entitled to damages and security in the amount Greka would have owed it had the parties entered into the Note Exchange in a timely manner. Greka attempts to define the argument as one between awarding RGC its expectancy interest as opposed to its reliance interest in signing the Term Sheet and foregoing its right to participate in the Merger.

*15 Greka asserts that:
[W]hether the Court derives an equitable remedy here based on promissory estoppel or on account of [the Term Sheet], we respectfully submit that it should carefully craft such remedy only to the extent needed to prevent injustice-not to create a windfall for RGC for its devalued preferred shares. Thus, RGC should be compensated for what it actually "gave up" in reliance, *not* as it seeks, [its expectancy interest that] it might theoretically have received if the Term Sheet were the Note itself, all of its terms were as RGC alleges, and Greka defaulted on all its obligations thereunder.[FN84]

> FN84. Defs.' Post-Trial Br., at 46. In attempting to calculate RGC's reliance interest in signing the Term Sheet, Greka argues that a ceiling must be set at

$6,600,000 as "Greka's willingness to pay *and RGC's willingness to accept* $6.6 million proves that justice cannot require any higher award." *See* Defs.' Post-Trial Br., at 47. If this were the case though, one must wonder why this litigation has proceeded for two years, resulting in a full trial and now a third judicial opinion. Either RGC was not willing to pay $6,600,000 in cash to RGC or RGC was not willing to accept it. The former is obviously the reality.

Among the problems facing Greka in constructing its argument, this is not a case where two parties who signed a term sheet simply could not in good faith agree on how to consummate the contemplated transaction. Rather, Greka, in bad faith, conditioned the Note Exchange on the renegotiation of a material term that it had previously reached a compromise on and knew RGC would never renegotiate. Greka, in bad faith, purposefully took a position which it knew would prevent any chance of the completion of the Note Exchange in hopes that it could force RGC to renegotiate the short selling provision that Greka had previously agreed to. This action is a direct breach of the *contractual* obligation Greka entered into to negotiate towards the Note Exchange in good faith. Greka is in no position to argue that the damages RGC suffered because of its bad faith refusal to consummate the Note Exchange are somehow less than if Greka had consummated the Exchange and then refused to pay off the Note when due.

Moreover, this is a case where Greka has received *all* of the consideration it bargained for during the negotiations of the Term Sheet. That is, Greka closed on its profitable Merger with Old Saba, a transaction that would not have been possible absent some agreement with RGC. After the Merger closed, Greka had no incentive to pursue the Note Exchange, and in bad faith, took action that it knew would likely endanger any possibility of the consummation of the Note Exchange unless RGC changed a position that it had consistently and repeatedly advocated throughout its entire relationship with Greka.

Finally, the doctrine of promissory estoppel as applied in Delaware does not require an award of damages to be limited to a party's reliance interest. As the Delaware Supreme Court noted in its landmark 1958 decision in *Chrysler Corp. v. Quimby,* "[t]here appears to be considerable uncertainty in the decisions respecting the correct rule of damages in promissory estoppel cases. The doctrine, at bottom, embodies the fundamental idea of the prevention of

Not Reported in A.2d                                                                                          Page 16
Not Reported in A.2d, 2001 WL 984689 (Del.Ch.), 27 Del. J. Corp. L. 955
(Cite as: Not Reported in A.2d)

injustice." [FN85] As noted by Chief Justice Southerland, damages in these cases have, among other possibilities, "secured for the promisee the expectancy or its value." [FN86] If the facts of a case so merit, a plaintiff may recovery its expectation interest from a recovery of damages in a promissory estoppel case. [FN87]

> FN85. Del.Supr., 144 A.2d 123, 133 (1958), *aff'd on rehearing*, 144 A.2d 885 (cited in the Reporter's note to the Restatement (Second) of Contracts § 90).

> FN86. *Id.* at 133-34 (quoting Fuller and Perdue, *The Reliance Interest in Contract Damages* 46 Yale L.J. 373, 405 (1936).

> FN87. *Id.* at 134; *see also* 3 Eric Mills Holmes, *Corbin on Contracts* § 8.8, at 21 (Joseph M. Perillo ed., rev. ed. 1996) ("[In promissory estoppel cases], the court can give judgment for expectation damages measured by the value of the promised performance."); *id.*, § 8.12, at 101-03; Daniel A. Farber & John H. Matheson, *Beyond Promissory Estoppel: Contract Law and the 'Invisible Handshake'*, 52 U. Chi. L.Rev. 903, 909-10 (1985) ("[R]ecent cases are heavily weighted towards the award of full expectation damages.... Courts are also willing to grant equitable remedies, such as specific performance or injunctive relief, in cases decided on a promissory estoppel theory."); Jay Feinman, *Promissory Estoppel and Judicial Method*, 97 Harv. L.Rev. 678, 687-88 (1984) ("[T]he typical damage remedy in promissory estoppel cases is measured by the expectation interest.... [I]n business cases, expectation recovery may better reflect opportunity losses than would reliance recovery.").

*16 Greka's argument is particularly tenuous here where RGC has not asked this Court to grant it an indeterminable estimation of future profits. Rather, RGC asks only to be awarded "exactly *what* Greka agreed to give RGC in the written Term Sheet (money and security), exactly *when* Greka should have given it, and at the rate (120% of principal) that Greka agreed [to] pay it." [FN88] In determining the amount of damages to award, the Court is guided not by speculation, but by how the parties themselves agreed to value Greka's obligations to RGC as embodied in the Term Sheet. Put another way, the

best measure of what RGC gave up (*i.e.*, its lost reliance interest) is the price that these two aggressive adversaries put on it after arms-length bargaining. Based on the facts of this case, where Greka breached its obligation to negotiate in good faith *and* RGC reasonably relied on the promises made by Greka and thereby took action to its detriment, the court may award damages and security in the amount equal to what RGC should have received if the Note Exchange had been consummated.

> FN88. Pl.'s Rep. Post-Trial Br., at 19. For example, RGC has not asked this Court to speculatively award it damages based on if RGC had converted some or all of the Note into Greka shares, or if RGC had invested the proceeds from the Note in a profitable business opportunity.

### B. *The Damages Calculation*

Although the parties largely agree on the structure of the calculation that must be used to determine what RGC is owed under the Term Sheet, Greka asserts the presence of several mistaken assumptions that may misinform the result. As a starting point, the Term Sheet provides:

The Note shall be due in cash on the 180th day following the Closing Date (the "Due Date"). On the Due Date, [Greka] shall be obligated to pay to RGC an amount in cash equal to 120% of the then outstanding principal amount thereof, plus all accrued and unpaid interest thereon in full satisfaction of the Note. [FN89]

> FN89. Term Sheet, at 1.

First, Greka contends that the damages calculation must take into account that Greka would have prepaid the amount due under the Note had the Note been signed. Under the Term Sheet, Greka was entitled to prepay any portion of the Note at any time at 104% of the principal amount being prepaid plus all accrued interest thereon. Simply put, there is no basis to conclude that Greka would have prepaid the Note, especially given the pattern of bad faith evidenced during the negotiations following the signing of the Term Sheet. Besides the bad faith breach discussed above, Grewal promised to pay approximately $7,000,000 to RGC by September 30, 1999. This promise to pay and a subsequent promise

Not Reported in A.2d                                                                    Page 17
Not Reported in A.2d, 2001 WL 984689 (Del.Ch.), 27 Del. J. Corp. L. 955
**(Cite as: Not Reported in A.2d)**

to pay by November 30, 1999 were not kept. Also, Greka never had the cash on hand to prepay the Note had it been outstanding. Greka insists though it "had the means to secure funds to pay RGC within 180 days of signing definitive documents."[FN90] This is pure conjecture and speculation, especially considering the promises to pay RGC in September and November 1999.

FN90. Defs.' Post-Trial Br., at 52.

Further, to allow Greka to pay off its obligations at the prepayment interest rate would effectively rewrite the terms of the Note. This was a 180-day debt instrument where the borrower (Greka) was obligated to pay the lender (RGC) 120% of principal plus interest when the debt was due. Greka's attempt to convert its *obligation* to pay back the Note using *rights it may not have been able to exercise* is entirely without merit.

*17 Second, Greka argues that it should not be responsible for paying: (i) registration payments outstanding for failure to register the Old Saba Series A Preferred, and (ii) accrued interest and dividends owed on the Old Saba stock. There is no dispute that these obligations were outstanding as of the date the parties entered the Term Sheet. The Term Sheet itself provides that the Note shall have "an aggregate principal amount equal to ... the aggregate Stated Value of the Series A Preferred Stock owned by RGC plus all accrued and unpaid interest, dividends and registration payments up to the closing date of the [Note Exchange]."[FN91] This language is clear on its face that Greka agreed to include the Old Saba registration payments, accrued interest and dividends in the Note. Any attempt to cloud the Note's plain meaning is without merit.

FN91. Term Sheet, at 1.

Lastly, Greka contends that it should not be made to pay any penalties for failure to register the Greka stock that RGC may have received through conversion or by exercising warrants. Greka points out that it had begun the registration process by April 1999 and that Greka did, in fact, register shares in 1999.[FN92] I therefore conclude that the evidence supports Greka's intention to register these shares of Greka stock had the Note Exchange been consummated. In an exercise of remedial discretion, registration payments and penalties relating to these Greka shares (as opposed to registration payments

related to the Series A Preferred) will not be included in the damage award.

FN92. Stahlecker Tr. 250-51; Davidson Tr. 520.

C. *The Lock-Up and Security Provisions*

The parties dispute whether RGC is entitled to specific performance of the Lock-Up Provision. The Term Sheet states:
The directors, officers and principal shareholders (including Capco ...) of [Greka] will enter into lock-ups prohibiting sales (including margin sales), transfers or other dispositions (including pledges) of Common Stock while the Note is outstanding.[FN93]

FN93. Term Sheet, at 3.

This provision would effectively prevent any directors, officers, or principal shareholders to be able to sell their stock to any person or entity until RGC was paid in full on the Note. The negotiation over this provision favorable to RGC was not a sticking point between the parties.[FN94]

FN94. Davidson Tr. 367.

Another key aspect of the proposed Note Exchange was that RGC would be a secured creditor.[FN95] That fact is not in dispute. The Term Sheet plainly states, "[t]he Note shall be secured by all collateral (broadly defined) of [Greka]."[FN96] Greka would have this Court convert RGC into an unsecured judgement creditor. Under the facts of this case, that would not be appropriate.

FN95. *See* Stahlecker Tr. 66-69, 99-100, Davidson Tr. 364-67.

FN96. Term Sheet, at 2.

Due either to Greka's bad faith breach or under the doctrine of promissory estoppel, the Court has the power to enforce these important provisions against Greka.[FN97] Enforcement of the terms of the Term Sheet as written is mandated and proper, but Greka has argued that the Court should deny specific performance of the Security and Lock-Up Provisions on the grounds that Greka has the present ability to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 984689 (Del.Ch.), 27 Del. J. Corp. L. 955
(Cite as: Not Reported in A.2d)

pay a judgment in this matter. Because specific performance might be unduly burdensome to Greka as an operating company, I will give it an opportunity to comply with the judgment of this Court by consummating a prompt financing transaction to pay the judgment. With that in mind, the Court will give Greka a reasonable period of time, sixty days from the issuance of this opinion, to tender payment in full of all damages including prejudgment interest and attorneys' fees assessed herein. If Greka does not pay RGC within sixty days, the court's final order will provide for the immediate enforcement of the Security Provision of the Term Sheet. The judgment will then become a fully secured, joint and several obligation of Greka and New Saba. I see no comparable reason, however, to delay the enforcement of the Lock-Up Provision. The Lock-Up Provision will be specifically enforced as of the date of this judgment, and will only be released upon full payment of the judgment assessed herein, including attorneys' fees.

FN97. *Branca v. Branca,* Del.Supr., 443 A.2d 929, 931 (1982) ("[I]n the usual case an equitable lien is impressed to reflect an express agreement that the property to be liened was intended to be security for the obligation of the promisor."); *see also Acacia Mut. Life Ins. Co. v. Newcomb,* Del. Ch., 21 A.2d 723, 724 (1941) ("[I]n most cases, an equitable lien on a particular fund can be created only by a contract which, in express terms, provides that it shall be held or transferred as security for some debt or obligation of the promisor." (citations omitted)).

*D. Prejudgment Interest*

**\*18** The awarding of prejudgment interest is entirely at the discretion of this Court.[FN98] Such an award is appropriate here as a result of Greka's breaches of its obligations under the Term Sheet. The legal rate of interest is a benchmark for the Court of Chancery, which can be deviated from in this court's discretion.[FN99] The legal rate is equal to the Federal Discount Rate plus 5%.[FN100] I see no reason to depart from that rate here.[FN101]

FN98. *Gaffin v. Teledyne,* Del.Supr., 611 A.2d 467, 476 (1992).

FN99. *Cole v. Kershaw,* Del. Ch., C.A. No.

13904, let. op. at 8, Jacobs, V.C. (Mar. 30, 2001).

FN100. *See* 6 Del. C. § 2301.

FN101. Because I have fashioned a damages and attorneys' fee remedy that seems to take away any benefit to Greka from its earlier refusal to pay, I see no reason to increase the legal rate. But I do note that any lesser award of damages will reward Greka, by turning its breach into an efficient one that would result in Greka having been able to hold RGC's money hostage and to use it at a cost of interest less than Greka's own borrowing rate.

Greka contends that if the Term Sheet is enforceable, prejudgment interest should be awarded at the 6% rate called for therein. Greka's argument is misplaced. The Term Sheet states, "The Note shall bear interest at the rate of 6% per annum payable in cash *at maturity, redemption or prepayment* or in common stock of [Greka] ... upon conversion of the Note."[FN102] The Note contemplated by the Term Sheet was not structured to be an indefinite loan, but rather a finite, six-month obligation with a 6% interest rate. That rate was only to apply for the life of the Note. Whether the Note fully matured or RGC exercised its conversion rights or Greka prepaid its obligation, under no circumstances could the Note remain outstanding after the passing of 180 days (unless the parties renegotiated). The 6% interest rate therefore has no relevancy in determining the rate of prejudgment interest to be applied after the expiration of the 180-day maturation period.

FN102. Term Sheet, at 1 (emphasis added).

To calculate the appropriate rate of prejudgment interest, the Court must first determine when prejudgment interest began to accrue. According to Grewal, the parties had a "collective understanding" that they would be executing the definitive documentation in "two to three weeks" following the signing of the Term Sheet.[FN103] In performing the damages calculation, the Court will therefore assume that the definitive documentation would have been signed on April 7, 1999, two weeks after the closing of the Merger and just over three weeks after the signing of the Term Sheet. Prejudgment interest will be awarded beginning on October 4, 1999, 180 days after April 7, 1999. From April 7, 1999, to October 4, 1999, RGC is entitled to the 6% interest rate agreed

Not Reported in A.2d                                                                 Page 19
Not Reported in A.2d, 2001 WL 984689 (Del.Ch.), 27 Del. J. Corp. L. 955
**(Cite as: Not Reported in A.2d)**

to in the Term Sheet. From October 4 until the date of the issuance of this opinion, RGC shall receive prejudgment interest as determined by averaging the composite Federal Discount Rate for 2000 (5.73%) with the average Discount Rate of each month from October 1999 to December 1999 and from January 2001 through July 2001.[FN104] Following this method, I arrived at a prejudgment interest rate of 5% plus 5.16%, equaling 10 .16%.

FN103. Grewal Tr. 639.

FN104. The months and their corresponding

composite Discount Rates are: 10/1999, 4.75%; 11/1999, 4.86%; 12/1999, 5.00%; 1/2001, 5.52%; 2/2001, 5.00%; 3/2001, 4.81%; 4/2001, 4.28%; 5/2001, 3.73%; 6/2001, 3.47%; 7/2001, 3.25%. The monthly figures are available online at http://www.federalreserve.gov/releases/H15/data/m/dwb.txt. Yearly figures are available at http://www.federalreserve.gov/releases/H15/data/a/dwb.txt.

### E. *The Damage Award*

The complete damages calculation is as follows:

| | |
|---|---:|
| "Closing Date" | 4/7/99 |
| Aggregate Principal Amount of Note pursuant to Term Sheet equals "Preferred Stock Value" which equals aggregate Stated Value of Series A Preferred Stock + Registration Payments + all accrued and unpaid interests and dividends | |
| Preferred Shares owned by RGC (7,159.3) | 7,159.30 |
| Aggregate Stated Value of Series A Preferred Stock (7,159.3 * $1,000) | $ 7,159,300.00 |
| Accrual Date of Preferred Stock (December 31, 1997) | 31-Dec-97 |
| Number of Accrual Days from December 1997 to "Closing Date" | 462 |
| Interest Rate on Preferred Stock (6%) | 6% |
| Accrued and unpaid interest and dividends on Preferred Stock | $ 543,714.51 |
| Registration Payments (capped at 10% of Stated Value of Preferred Stock) | $ 715,930.00 |
| Principal Amount of Note (Stated Value + Registration Payments + Accrued Interest) at "Closing Date" | |
| | $ 8,418,944.51 |
| | |
| Maturity Calculations: 120% of Principal + 6% Accrued Interest due at Maturity (180 days) under Note | |
| Accrual Date ("Closing Date") | 4/7/99 |
| Maturity Date 180 Days Later ("Due Date") | 10/4/99 |
| *120% of Principal Amount Calculation:* | |
| Principal at Maturity (at "Due Date") | $ 8,418,944.51 |
| | 120% |
| 120% of the Outstanding Principal Amount at Maturity (at "Due Date") | |
| | $ 10,102,733.41 |
| *Interest Calculation on Principal for 6 months* | |
| Principal at Issuance (at "Closing Date") | $ 8,418,944.51 |
| Interest Rate | 6% |

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 984689 (Del.Ch.), 27 Del. J. Corp. L. 955
**(Cite as: Not Reported in A.2d)**

| | |
|---|---:|
| Accrual Days | 180 |
| Accrued Interest on Principal | $   249,108.50 |
| | |
| Maturity Value (120% Outstanding Principal at maturity + Accrued Interest) | |
| | $ 10,351,841.91 |
| Fed Discount Rate Average From "Due Date" | 5.16% |
| | 5.00% |
| Legal Rate of Interest (6 Del. C. 2301) (Fed Discount Rate + 5%) | |
| | 10.16% |
| Estimated date of payment by Greka | 8/22/01 |
| Accrual Days ("Due Date"-Estimated date of payment by Greka) | 748 |
| Accrued Pre-judgment Interest through Estimated date of payment by Greka | |
| | $   2,155,361.26 |
| Amount due on August 22, 2001 | $ 12,507,203.17 |

**\*19** The total damages including prejudgment interest owed by Greka to RGC equals $12,507,203.17.

### VI. *Attorneys' Fees*

RGC maintains that it is entitled to reimbursement of its attorneys' fees reasonably incurred pursuant either to a specific provision in the Term Sheet or under the equitable discretion of this Court.

The Term Sheet states:

*Whether or not the transaction closes,* [Greka] agree[s] to reimburse RGC *for all expenses* reasonably incurred by it in connection with the transaction contemplated hereby, *including, without limitation, reasonable expenses for attorneys.*[FN105]

FN105. Term Sheet, at 4 (emphasis added).

Although the plain language of this provision supports RGC's request for its attorneys' fees, Greka argues that the provision does not include any reference to litigation related expenses.[FN106] However, this provision expressly contemplates the reimbursement of *all* expenses including those for attorneys. [FN107] If the parties had wanted to exclude litigation expenses from the broad wording of this provision, they could easily have specified that. Greka essentially argues that this broad provision does not cover expenses RGC incurred in enforcing rights that Greka deprived it of in bad faith. Greka's position is untenable. RGC gave it many chances and much time to live up to its

duties without litigation. What is "reasonable" depends on the circumstances. Having been stiffed by Grewal time and again, it was perfectly reasonable for RGC to seek to consummate the Note Exchange it deserved through the court system. These fees reasonably incurred by RGC are covered by the applicable Term Sheet provision.

FN106. Greka does not argue that this provision of the Term Sheet did not create an enforceable obligation. *See* July 12, 2001 Oral Argument Tr., at 78-80.

FN107. *See Northwestern Nat'l Ins. Co. v. Esmark,* Del.Supr., 672 A.2d 41, 44 (1996) (noting that interpretations of agreements that attempt to add limitations not found in the plain language of the contract are untenable).

Alternatively, it is within this Court's equitable discretion to award attorneys' fees as costs under 10 *Del C.* § 5106 and Court of Chancery Rule 54(d).[FN108] Although, typically, each party to a litigation must bear its own litigation expenses under the "American Rule", "this Court has the power to award attorneys' fees where the party against whom the fees are assessed has acted, *inter alia,* in bad faith or vexatiously."[FN109] For example, in *Stone v. Hungerford,*[FN110] Vice Chancellor (now Justice) Steele granted plaintiffs' petition for costs and reasonable attorneys' fees under the bad faith exception to the American Rule where the defendant resorted to burdensome and protracted litigation in hopes of discouraging the plaintiffs from enforcing their contractual rights despite the indefensibility of the defendant's legal position. Similarly, here, RGC was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                              Page 21
Not Reported in A.2d, 2001 WL 984689 (Del.Ch.), 27 Del. J. Corp. L. 955
**(Cite as: Not Reported in A.2d)**

forced by Greka's bad faith conduct to litigate to consummate the transaction contemplated in the Term Sheet. In so concluding, I specifically find that Grewal purposefully stiffed RGC in the post-Merger negotiation process in order to try to force RGC to settle for pennies on the dollar. This litigation would not have been necessary if Grewal had behaved in a minimally responsible fashion. And Greka could have paid RGC far less than it will have to now, if its CEO had not acted with such obstinacy.[FN111] The awarding of attorneys' fees to RGC is therefore warranted under the "bad faith" exception to the American Rule as well.

> FN108. *In re Charles Wm. Smith Trust,* Del. Ch., C.A. No. 16902, mem. op. at 5, Jacobs, V.C. (July 23, 1999).

> FN109. *Abex,* mem. op. at 37; *see also Johnston v. Arbitrium (Cayman Islands) Handels,* Del.Supr., 720 A.2d 542, 546 (1998).

> FN110. Del. Ch., C.A. 14494, let. op. at 5-6, Steele, V.C. (July 25, 1997).

> FN111. Without delving too deeply into this subject, it is also the case that Greka has advanced a bewildering array of "theories" to justify Grewal's misconduct. These theories, to be charitable, had minimal grounding in fact or law, and made this litigation more expensive than it should have been. I also note that Grewal's conduct related to this litigation involved the filing of false affidavits to another court regarding his availability to participate in proceedings in that other forum, a fact that contributed to my decision to give little credit to his testimony.

**\*20** Nevertheless, RGC may not recover for all of its fees incurred with respect to this litigation. There are two sets of claims for which RGC may recover all of its attorneys' fees from Greka: (i) all fees related to the successful Term Sheet Claims, and (ii) all fees related to its defense (and resulting dismissal) of the short selling counterclaims filed by Greka. But RGC may not recover for its attorneys' fees incurred in connection with the eight counts dismissed in *Greka I.*

VII. CONCLUSION

For all the foregoing reasons, judgment is therefore entered in favor of RGC for $12,507,203.17 (which includes the award of pre-judgment interest). RGC is also

awarded its reasonable attorneys' fees as specified herein. The parties shall present a conforming order within ten days of today, and report on whether they have agreed on a sum to resolve plaintiffs' entitlement to attorneys' fees.

Del.Ch.,2001.
RGC Intern. Investors, LDC v. Greka Energy Corp.
Not Reported in A.2d, 2001 WL 984689 (Del.Ch.), 27 Del. J. Corp. L. 955

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.