## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MHS HOLDING ONE, INC. f/k/a )
MCCLELLAND HOME HEALTH )
PHARMACY, INC., )
                                )
        Plaintiff, )
                                )
    v. )          C.A. No. 06-292-GMS
                                )
MHHP ACQUISITION COMPANY, )
LLC and OMNICARE, INC., )
                                )
        Defendants. )
_____ )

## DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO
## DEFENDANTS' MOTION TO STRIKE ATTORNEYS' FEE CLAIM
## AND MEMORANDUM OF LAW IN SUPPORT THEREOF

Defendants, MHHP Acquisition Company, LLC and Omnicare, Inc. (collectively, the "Defendants") respectfully submit this Reply to Plaintiff's Opposition to Defendants' Motion to Strike Plaintiff's Attorney's Fee Claim ("Opposition") and incorporated memorandum of law in support thereof:

1.     Defendants moved to strike the attorney's fee claim pled in Plaintiff's Complaint on the grounds that Plaintiff had not and could not allege any statutory or contractual right to recover such fees. *Complaint, ¶ ad damnum clause; Defendant's Motion to Strike Attorney's Fees Claim, ¶ 3.*

2.     Plaintiff's Opposition appears to concede this point, as it fails to address or point to any proper statutory or contractual basis for its claim to recover attorney's fees.

3.     Delaware law follows the American Rule, whereby a prevailing party pays its own attorney's fees and costs unless the payment of fees is authorized by provision of contract or

statute. *Casson v. Nationwide Ins. Co.*, 455 A.2d 361 (Del. Super. 1982); *Montgomery Cellular Holding Co., Inc. v. Dobler*, 880 A.2d 206 (Del.Supr. 2005). Under Delaware law, plaintiff's claim for attorney's fees is properly stricken where no contractual or statutory basis for the claim is alleged. *New Castle County Vocational-Technical Ed. Ass'n v. Bd. of Ed. of the New Castle County Vocational-Technical School District*, 1985 WL 552280, *2 (Del. Super. 1985)(upon hearing defendant's motion to dismiss, the court granted defendant's motion strike plaintiff's attorney's fees claim where the plaintiff had "not cited either statute or contract provision upon which attorney's fees may be awarded") (Ex. A hereto). Accordingly, Plaintiff's claim for attorney's fees must be stricken as plaintiff has alleged no existing or ripe factual or legal basis for the recovery of attorney's fees.

4.    Rather than address its deficient pleading, Plaintiff argues that it is asserting a claim for fees based on Delaware's "bad faith" exception to the American Rule. *Opposition*, ¶ 2. Plaintiff claims that it would be premature to strike the attorney's fees claim because, the argument continues, "it is *possible* that factual developments or misconduct *could occur that may* merit the award of attorney's fees pursuant to the bad faith exception to the American Rule, as recognized by Delaware law." (emphasis added), *Opposition*, ¶ 4.

5.    Clearly, the Plaintiff's claim for fees is based not in fact but in speculation of "possible factual developments" concerning the parties' litigation conduct yet to come. Having no grounds for this claim, Plaintiff should not be permitted to assert as a present issue to be litigated that which is not an issue. Asserting a claim that knowingly does not exist should not be permitted, and Plaintiff's claim for attorney's fees is properly stricken at this juncture without prejudice.

6.    Should Plaintiff later wish to assert a claim for attorney's fees and allege facts based on the Defendant's litigation conduct, then such a claim is certainly more appropriately presented by petition or motion after, and if, Plaintiff prevails on its breach of contract claims.

7.    Plaintiff appears to rely upon *RGC Int'l Investors, LDC v. Greka Energy Corp.*, 2001 WL 984689 (Del. Ch. August 22, 2001) (Ex. B hereto) in support of its argument that its claim for fees at this stage is appropriate. The *RGC* case did not, however, address the appropriateness of the timing of the prevailing party's claim for fees. In fact, the case to which *RGC* refers, namely *Stone v. Hungerford*, 1997 WL 441192 (Del. Ch. July 25, 1997) (Ex. C hereto), illustrates clearly that the prevailing party *petitioned for fees* based on the losing party's resort to protracted and burdensome litigation.

8.    In summary, not only is Plaintiff without any statutory or contractual right to assert a claim for attorney's fees, but Plaintiff is also unable to allege or assert any current basis for claiming attorney's fees pursuant to the bad faith exception to the American Rule. Thus, Plaintiff's claim to fees is premature at best and wholly unsupported.

WHEREFORE, the Defendants respectfully request that Plaintiff's claim for attorney's fees be stricken without prejudice to its right to later petition for attorney's fees, if appropriate.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Thomas C. Dearing
Bethany V. Crawley
FOWLER WHITE BOGGS
BANKER, P.A.
50 N. Laura Street, Suite 2200
Jacksonville, Florida 32202
(904) 598-3100

739284
Dated: June 30, 2006

By:    */s/ David E. Moore*
        Philip A. Rovner (#3215)
        David E. Moore (#3983)
        Hercules Plaza
        Wilmington, Delaware 19801
        (302) 984-6000
        rhorwitz@potteranderson.com
        dmoore@potteranderson.com

*Attorneys for Defendants*

3

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on June 30, 2006, the within document was filed with the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the following; that the document was served on the following counsel as indicated; and that the document is available for viewing and downloading from CM/ECF.

### BY HAND DELIVERY AND E-MAIL

Philip Trainer, Jr., Esq.
Tiffany Geyer Lydon, Esq.
Ashby & Geddes
222 Delaware Avenue, 17th Floor
P. O. Box 1150
Wilmington, DE  19899
ptrainer@ashby-geddes.com
tlydon@ashby-geddes.com

I hereby certify that on June 30, 2006, I have sent by E-mail  the foregoing document to the following non-registered participants:

Dennis J. Kelly, Esq.
Paul R. Mastrocola, Esq.
Burns & Levinson LLP
125 Summer Street
Boston, MA  02110
dkelly@burnslev.com
pmastrocola@burnslev.com

_____/s/ David E. Moore_____
Philip A. Rovner (#3215)
David E. Moore (#3983)
Potter Anderson & Corroon LLP
Hercules Plaza
P.O. Box 951
Wilmington, Delaware 19899
(302) 984-6000
E-mail: provner@potteranderson.com
           dmoore@potteranderson.com

# EXHIBIT A

Not Reported in A.2d
Not Reported in A.2d, 1985 WL 552280 (Del.Super.)
**(Cite as: 1985 WL 552280 (Del.Super.))**
H

Only the Westlaw citation is currently available

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware.
**NEW CASTLE COUNTY VOCATIONAL-
TECHNICAL EDUCATION ASSOCIATION**
v.
**BOARD OF EDUCATION OF THE NEW
CASTLE COUNTY VOCATIONAL-
TECHNICAL SCHOOL
DISTRICT**
No. CIV.A. 83C-OC-5.

Submitted: Dec. 4, 1984.
Decided: March 4, 1985.
Sheldon N. Sandler, Esq., Young, Conaway,
Stargatt & Taylor, Wilmington.

Jeffrey M. Weiner, Esq., Bayard, Brill &
Handelman, P.A., Wilmington.

BIFFERATO, J.

**\*1** Gentlemen:

This is an action for breach of contract and breach
of duty to bargain in good faith arising out of a
labor dispute between the New Castle County
Vocational-Technical Education Association, the
teachers' association (hereinafter "Plaintiff"), and
the Board of Education of the New Castle County
Vocational-Technical School District, the School
Board (hereinafter "Defendant"). Now before the
Court is defendant's motion to dismiss.

This action began in August, 1982 when a
complaint similar to the complaint *sub judice* was
filed in Chancery Court. In that action the parties
stipulated to dismissal of the action without
prejudice.

On October 14, 1982, a similar action was filed in
this Court. On October 19, 1982, plaintiff (both
then and now) filed a unilateral notice of dismissal
pursuant to Superior Court Civil Rule 41(a)(1), and
the case was dismissed.

On October 19, 1982, another similar claim was

filed by plaintiff in the United States District Court
for the District of Delaware. That suit was dismissed
upon a summary judgment motion for lack of
subject matter jurisdiction.

Defendant argues that the two-dismissal rule
contained in Superior Court Civil Rule 41(a)(1) is a
bar to this suit. Rule 41(a)(1) prevents the
unreasonable use of plaintiff's right to dismiss an
action prior to the filing of an answer or summary
judgment motion. *Poloron Products, Inc. v.
Lybrand Ross Bros. & Montgomery,* 534 F.2d 1012
(2d Cir.1976). The rule requires two prior
dismissals. The Chancery Court decision was
dismissed by stipulation, not notice of dismissal,
and is not a dismissal for purposes of Superior Court
Civil Rule 41(a)(1). *New Castle County Vocational
Technical Education Assoc. v. Bd. of Education of
the New Castle County Vocational-Technical School
District,* 569 F.Supp. 1482 (D.Del.1983). The
District Court suit was dismissed after a motion for
summary judgment and, hence, does not constitute a
dismissal under Superior Court Civil Rule 41(a)(1).
*See American Cyanamid Co. v. McGee,* 317 F.2d
295 (5th Cir.1965). Therefore, at best, only the
prior Superior Court action constitutes a prior
dismissal. Superior Court Civil Rule 41(a)(1) does
not bar this suit.

Defendant next argues that this suit is time-barred
pursuant to 10 *Del.C.* § 8111 which sets a one year
statute of limitations on actions for work labor or
personal services. Plaintiff argues that the three year
statute of limitations in 10 *Del.C.* § 8106 is
applicable. 10 *Del.C.* § 8111 was enacted to cover
all claims arising out of the employer-employee
relationship. *Goldman v. Braunstein's, Inc.,*
Del.Supr., 240 A.2d 577 (1968). This is, in
essence, an action for salary and is therefore
governed by 10 *Del.C.* § 8111.

Defendant's claim, that the one year statute of
limitations bars this suit, would be persuasive absent
10 *Del.C.* § 8118. 10 *Del.C.* § 8118 allows an
additional year after the dismissal of a suit if the
action was dismissed for a matter of form. A
dismissal for lack of jurisdiction is a defeat as a
matter of form within the meaning of 10 *Del.C.* §
8118. *Howmet Corporation v. City of Wilmington,*
Del.Super., 285 A.2d 523. *Howmet* is directly on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
(Cite as: 1985 WL 552280, *1 (Del.Super.))

point. In *Howmet* the plaintiff's suit was originally brought in District Court, but the case was dismissed for lack of jurisdiction. The case was subsequently brought in Superior Court where then Judge Quillen held that the "saving" statute gave plaintiff an additional year to file a new complaint. The underlying principle, in applying the saving statute, is to allow a trial to proceed on the merits. *Id.* The facts of the case *sub judice* are similar to those in *Howmet,* and merit the same result. The District Court action was filed in October, 1982, and was dismissed on August 29, 1983. The saving statute allows plaintiff one year to refile from the "abatement or other determination of the original action." 10 *Del.C.* § 8118. This action was filed on October 3, 1983. Thus, this action is timely and not barred by the statute of limitations.

**\*2** Defendant also argues that even if it breached the statutory duty to bargain in good faith, that breach cannot form the basis of a breach of contract action. Plaintiff, in turn, argues that the failure to bargain in good faith, as required by statute, is a separate claim from the breach of contract action. Both sides rely on *Lane v. Board of Directors, Me.Supr.,* 447 A.2d 806 (1982).

In *Lane,* the Maine Supreme Court held that a statutory duty to bargain in good faith did not constitute a basis for breach of contract. In *Lane,* the plaintiff had only brought a breach of contract action, and had not alleged a breach of the statutory duty:
> "Inasmuch as Lane has limited her claim to that of breach of contract and no contract exists in the instant case, we hold that...judgment for the defendant was not in error."
> *Lane, supra,* at 810.

In the present action the plaintiff has alleged both a breach of contract and a breach of the statutory duty to bargain in good faith, thereby distinguishing *Lane.* Plaintiff must prove the breach of statutory duty, and the damages that were caused thereby. However, as in the *Lane* case, the breach of duty will not be sufficient to recover contractual damages. *Lane, supra,* at 810. The damages for such a breach must be shown to have flowed from the breach of duty specifically, not the breach of contract.

Finally, defendant argues that the plaintiff has

failed to state a claim upon which attorneys' fees can be granted, and that portion of the damage claim should be dismissed. Attorneys' fees may only be awarded in actions at law, when it is done pursuant to a contract or statutory provision. *Casson v. Nationwide Insurance Co.,* Del.Super., 455 A.2d 361 at 269-70 (1982). Plaintiff has not cited either statute or contract provision upon which attorneys' fees may be awarded. Thus, the motion to strike the claim for attorneys' fees is GRANTED.

In summary, defendant's motion to dismiss on grounds of the two-dismissal rule, statute of limitations, and failure to state a claim, are DENIED, while the motion to strike the claim for attorneys' fees is GRANTED. IT IS SO ORDERED.

Not Reported in A.2d, 1985 WL 552280 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# EXHIBIT B

Not Reported in A.2d                                                                 **Page 1**
Not Reported in A.2d, 2001 WL 984689 (Del.Ch.), 27 Del. J. Corp. L. 955
**(Cite as: 2001 WL 984689 (Del.Ch.))**
Н

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
**RGC INTERNATIONAL INVESTORS, LDC**
**Plaintiff,**
v.
**GREKA ENERGY CORPORATION, Saba**
**Petroleum Company f/k/a HVI Acquisition**
**Corporation, Randeep S. Grewal, William N.**
**Hagler, Dr. Charles A. Kohlhaas,**
**Alex S. Cathcart and Dr. Jan F. Holtrop,**
**Defendants.**
**No. CIV.A.17674.**

Submitted: July 12, 2001.
Decided: Aug. 22, 2001.
Martin S. Lessner, C. Barr Flinn, and John J.
Paschetto, Esquires, of Young Conaway Stargatt &
Taylor, Wilmington, Delaware; of Counsel:
Michael R. Klein, Robert F. Hoyt, and Christopher
A. Wilber, Esquires, of Wilmer, Cutler &
Pickering, Washington, D.C., Attorneys for
Plaintiff.

Edward P. Welch, Edward B. Micheletti, Lorin M.
Hochman, Esquires, of Skadden, Arps, Slate,
Meagher & Flom, Wilmington, Delaware; of
Counsel: Marco E. Schnabl, William J. Hine, and
William J. O'Brien, III and Mark Lebovitch,
Esquires, of Skadden, Arps, Slate, Meagher &
Flom, New York, New York; Attorneys for
Defendants Greka Energy Corporation, Saba
Petroleum Company, Randeep S. Grewal, William
N. Hagler, Alex S. Cathcart and Dr. Jan F.
Holtrop.

Dr. Charles A. Kohlhaas, Pro Se Defendant.

MEMORANDUM OPINION

STRINE, Vice Chancellor.

**\*1** Plaintiff RGC International Investors, LDC
("RGC") brings this action against defendants Greka
Energy Corporation ("Greka"), Saba Petroleum
Corporation ("New Saba"), and certain individual
defendants affiliated with Greka. [FN1] The dispute
between these parties centers around the purchase by
Greka (through an acquisition subsidiary, HVI

Acquisition Corporation ("HVAC")) of the former
Saba Petroleum Corporation ("Old Saba") in a
March 22, 1999 merger (the "Merger").

> FN1. These individual defendants are Randeep S.
> Grewal, William N. Hagler, Dr. Charles A.
> Kohlhaas, Alex S. Cathcart, and Dr. Jan F. Holtrop.
> To simplify matters slightly, I typically refer to
> Greka when I am referring to the arguments
> presented by all of the defendants.

Before the Merger, RGC owned "Series A
Preferred" stock in Old Saba with certain
enumerated rights including a right of redemption.
As all of the parties clearly understood at the time,
the Merger could not proceed unless some
agreement was reached as to the fate of the Series A
Preferred stock. To address this issue, Greka, Old
Saba, and RGC negotiated and executed on March
15, 1999 a detailed term sheet (the "Term Sheet")
that contemplated a transaction (the "Note
Exchange") through which the Series A Preferred
shares would be exchanged for a convertible debt
instrument (the "Note") from Greka. The Note
Exchange was conditioned on final, definitive
documentation and the successful closing of the
Merger.

In the Term Sheet, the parties stated their mutual
agreement to negotiate in good faith and in an
expedited manner towards the Note Exchange.
Although the Merger closed a week after the signing
of the Term Sheet, approximately nine months
passed without an agreement on the definitive
documentation of the Note Exchange. RGC filed
this lawsuit, having lost faith in its negotiating
adversary to reach a final agreement to consummate
the Note Exchange.

In a prior opinion, this court granted a motion by
the defendants to dismiss all claims presented by
RGC that were based on the contractual and other
rights RGC possessed before the Merger. But, in
that same opinion, this court concluded:
RGC's complaint states a claim for breach of the
Term Sheet and for relief under the doctrine of
promissory estoppel (collectively, the "Term Sheet
Claims"). It is clear that RGC and Greka materially
altered their positions in reliance upon the accord
outlined in the Term Sheet. As a result, this

Not Reported in A.2d
(Cite as: 2001 WL 984689, *1 (Del.Ch.))

litigation must focus on the legal consequences of that agreement and the parties' subsequent conduct under it. [FN2]

> FN2. *RGC International Investors, LDC v. Greka Energy Corp.*, Del. Ch., mem. op. at 1-2, Strine, V.C. (November 6, 2000) (footnote omitted) ("*Greka I* ") This lawsuit also produced a subsequent opinion that dismissed counterclaims arising from the allegation that RGC engaged in a purposeful plan to drive down the market price of Old Saba's stock through a pattern of short-selling transactions. *See RGC International Investors, LDC v. Greka Energy Corp.*, Del. Ch., mem op., Strine, V.C. (March 7, 2001, corrected March 13, 2001) ("*Greka II* ")

In this opinion, following a full trial on the merits, I concluded that Greka was responsible for the breakdown in the negotiations between the parties following the signing of the Term Sheet. The parties signed the Term Sheet, a thoroughly negotiated, detailed document that included a compromise reached by the parties on the issue of RGC's short-selling of Greka securities. One week after the signing of the Term Sheet, Greka closed the Merger, a very profitable transaction from its perspective. Thereafter, Greka purposefully and persistently ignored the obligations it had assumed under the Term Sheet. Specifically, Greka attempted to renegotiate the previously agreed to issue concerning short selling and simply ignored any obligation to reach on an expedited basis a final agreement regarding the Note Exchange. Based on these acts of bad faith, I conclude that the plaintiffs are not only entitled to damages of $12,507,203.17 (including prejudgment interest), but all their reasonably incurred attorneys' fees as well.

### I. *The Parties*
*2 Plaintiff RGC is a Cayman Islands limited duration company that owned 7,310 Series A Preferred shares of Old Saba before Old Saba was merged out of existence. Old Saba was an energy company involved in the acquisition, exploration, and development of oil and gas properties throughout the world.

Defendant Greka is also an energy company that uses a proprietary horizontal drilling technology to maximize production of established oil and gas reservoirs.

Defendant New Saba is a subsidiary of Greka formerly known as HVAC before the Merger. HVAC took the "Saba" name after merging with Old Saba even though HVAC, and not Old Saba, was the surviving corporation in the Merger.

Defendant Randeep S. Grewal was at all relevant times Greka's Chairman of the Board, Chief Executive Officer ("CEO"), and controlling shareholder. On October 8, 1998, Grewal assumed a directorship of Old Saba. As of the time of the Merger, Grewal had become the Chairman and CEO of Old Saba as well. Since the Merger, Grewal has served as Chairman and CEO of New Saba in addition to his responsibilities with Greka.

The remaining defendants, Messrs. Hagler and Cathcart and Drs. Kohlhaas and Holtrop, were directors of Old Saba at the time of the Merger.

### II. *Factual Background*
The court's previous decision in *Greka I* extensively described the events leading up to and including the negotiation of the Term Sheet. As noted above, *Greka I* indicated that the subsequent litigation, most notably, the trial, must focus on the legal consequences of the Term Sheet and the parties' conduct under it. [FN3] To the extent the events before the negotiation of the Term Sheet are relevant and necessary for the purposes of this opinion, they are related briefly below. The facts relating to the negotiation, execution, and subsequent breach of the Term Sheet, as developed at the trial, are described more thoroughly.

> FN3. *Greka I*, mem. op. at 1-2.

### A. *RGC Invests In Old Saba*
On December 31, 1997, RGC purchased 10,000 shares of the newly created Series A Preferred stock from Old Saba for $10,000,000 pursuant to a Securities Purchase Agreement ("SPA"). [FN4] Also on that day, Old Saba filed a Certificate of Designations as an amendment to its certificate of incorporation, outlining in detail the features and rights attaching to the Series A Preferred shares. RGC also had certain rights under a Registration Rights Agreement entered into on that same day.

> FN4. Before the events at issue in this lawsuit, Old Saba redeemed 2,000 of the Series A Preferred shares in exchange for $2,150,000. Thus, for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



purposes of the events at issue in this dispute. RGC owned 8,000 Series A Preferred shares. These 8,000 Series A shares represented all of the shares of that series of Old Saba stock.

### B. RGC's Rights as a Holder of the Series A Preferred Shares

The SPA and the Certificate of Designations specified a number of rights and protections belonging to Old Saba's Series A Preferred shares. These rights had important implications with regard to any potential acquisition of Old Saba.

First, the Certificate of Designations required Old Saba to redeem the Series A Preferred shares at a formula-fixed price at the option of RGC in the event that Old Saba failed to obtain timely effectiveness with the Securities and Exchange Commission (the "SEC") of the Registration Statement for the Series A Preferred shares (the "Mandatory Redemption Provision"). [FN5] Old Saba did not obtain the required SEC approval within the required time. Thus, during the period of negotiations that eventually led to the Term Sheet, RGC had the right to demand consideration from Old Saba in accordance with the formula provided in the Mandatory Redemption Provision.

FN5. Cert. of Desig. Art. V.A(ii)

*3 Second, the Certificate of Designations contained a provision that provided the Series A Preferred shares with certain rights in the event of a merger. Foremost among these rights, the Series A Preferred shares would possess the same rights, including the Mandatory Redemption Provision rights (adjusted for the Merger conversion ratio) against the acquiring entity as it did against Old Saba.

Third, under the SPA, so long as RGC held the Series A Preferred shares, Old Saba was barred from consummating a merger unless the surviving corporation in the merger: i) assumed the obligations Old Saba owed to RGC under the Certificate of Designations and the Securities Purchase Agreement; and ii) was "a publicly traded corporation whose Common Stock is listed for trading on the Nasdaq, Nasdaq SmallCap, NYSE, or AMEX." [FN6]

FN6. Securities Purchase Agreement § 4(j).

### C. The Financial Condition of Old Saba Before the Merger

By the middle of 1998, Old Saba was struggling financially. According to the proxy statement filed in connection with the Merger (the "Proxy Statement"), Old Saba then had a working capital deficit of nearly $30,000,000 and was in default on $20,000,000 of its $30,500,000 debt. [FN7] Among its debts, Old Saba was having a particularly difficult time meeting its obligations to Bank One, the company's first secured creditor which held a security interest of $26,000,000 in Old Saba. Old Saba's stock price had plummeted to approximately $1-2 per share. Old Saba's auditors had issued warnings questioning the company's ability to continue as a going concern. [FN8] Adding to these problems, the American Stock Exchange was considering delisting Old Saba.

FN7. Proxy Statement at 20, 26.

FN8. Id. at 20.

### D. Greka Begins Discussions with RGC to Acquire Old Saba

In the fall of 1998, Greka began talks with Old Saba about a merger between Old Saba and Greka's wholly-owned acquisition subsidiary, HVAC. A possible acquisition made sense to Greka due to the potentially complementary relationship between Greka's horizontal drilling technology and Old Saba's assets such as its existing oil fields. Greka recognized, however, that due to the existence of the Series A Preferred shares, it must negotiate with RGC if Greka was to acquire Old Saba.

During this period, as Grewal testified, he told RGC that he wanted to pursue a bankruptcy transaction. Specifically, Grewal stated at trial that Old Saba was "a bankrupt company that is an ideal bankruptcy case and what I would like to do is put it through 11, clean it up, as I have before, and bring it out without any baggage attached to it." [FN9] According to Grewal, RGC represented to him over drinks at the Four Seasons hotel in New York that if Greka performed an equity transaction as opposed to a bankruptcy transaction, RGC would waive penalties that had accrued under the rights held by the Series A Preferred shares and would not engage in short sales of Greka common stock. [FN10] Without commenting specifically on the veracity of this recounting, I note that there is no testamentary



Not Reported in A.2d
(Cite as: 2001 WL 984689, *3 (Del.Ch.))

or documentary evidence that corroborates this account. Rather, as will be detailed below, the parties later entered into a Term Sheet agreement that specifically dealt with the issues that supposedly were discussed at the Four Seasons meeting, but that agreement in no way evidences the positions that either Grewal or RGC allegedly represented at the Four Seasons meeting.

> FN9. Grewal Tr. 738. (Trial testimony is herein cited as "[witness] Tr. ___.") As revealed by questioning by opposing counsel, Grewal's "expertise" and "experience" in putting companies through bankruptcy proceedings were not as extensive as his comments seem to imply. To put it bluntly, Grewal's supposed expertise purchasing companies out of bankruptcy and bringing them to health has not been demonstrated. *See* Grewal Tr. 880- 83.

> FN10. Grewal Tr. 735-40, 747-57.

*4 On October 5, 1998, Greka reached an initial accommodation with RGC, which at that time already possessed the right to trigger a Mandatory Redemption of the Series A Preferred shares. [FN11] The accord between RGC and Greka (the "Option Agreement") involved: (1) the purchase by Greka of 690 of RGC's 8,000 Series A Preferred shares for $750,000; (2) the granting to Greka of an exclusive option to purchase up to 6,310 of the remaining Series A Preferred shares for nearly $6.9 million through November 5, 1998, with the right to extend that option for another month for $500,000; and, (3) agreement between the parties to a formula by which Greka could buy out the remaining 1,000 Series A Preferred shares held by RGC. In the event that Greka actually exercised its option, RGC agreed to waive its rights under the Mandatory Redemption Provision.

> FN11. The real world value of the Mandatory Redemption right was, of course, severely limited by Old Saba's financial difficulties.

Having agreed to the Option Agreement with RGC, Greka soon reached an accord with Old Saba on October 8, 1998 (the "Common Stock Purchase Agreement") to purchase 2,500,000 newly issued Old Saba common shares by December 4, 1998. At the time of the signing of the Common Stock Purchase Agreement, Grewal was added to the Old

Saba board.

As to the possibility of placing Old Saba into bankruptcy, I also note that there is no evidence that Old Saba's then controlling stockholder and Chairman of the Board, Ilyas Chaudhary, was prepared to put the company into Chapter 11 so that Grewal could pick it up on the cheap. If Grewal wanted a deal in any certain time frame, he had to address Chaudhury's interests. Indeed, Grewal did deal directly with Chaudhary and had Greka purchase nearly 3,000,000 Old Saba shares (approximating 29% of Old Saba's then outstanding common stock) from Chaudhary in November, 1998 at a substantial premium to market. This purchase increased Greka's ownership to 34.7% of outstanding Old Saba common stock. After that point, Greka could only "purchase" Old Saba out of bankruptcy if it washed out its *own* equity stake and opened itself to competition from other bidders. [FN12]

> FN12. Grewal, in his testimony, seemed to believe he could, as a control person, put Old Saba through a bankruptcy proceeding in which all equity holders, other than Greka, would lose their stake and from which Old Saba would emerge with less debt and Greka in firm control. *See* Grewal Tr. 897-900. This fantastic scenario would, I believe, be illegal under several legal theories, including the Delaware law of fiduciary duty.

### E. Greka Fails to Complete the Purchases Contemplated by the Option Agreement But Secures an Agreement to Merge with Old Saba

As of December 6, 1998, Greka had not exercised its option to purchase the second installment of 6,310 Series A Preferred shares pursuant to the Option Agreement. On December 7, 1998--the day after Greka's Option Agreement with RGC expired-- Greka and Old Saba announced that they had reached an agreement whereby Old Saba would merge with HVAC in a stock-for-stock merger.

On December 18, 1998, Old Saba, Greka, and HVAC officially entered into an Agreement and Plan of Merger (the "Merger Agreement") and announced their intention to submit the transaction for shareholder approval. The Merger Agreement, as amended, provided for a fixed consideration of 1,240,000 shares of Greka to be paid to Old Saba's

Not Reported in A.2d

(Cite as: 2001 WL 984689, *4 (Del.Ch.))

Page  5

common shareholders At the same time, Greka and Old Saba indicated that negotiations with RGC would be commenced to extend Greka's now-expired Option Agreement with RGC or to reach another accommodation with RGC regarding the Series A Preferred shares.

*5 In recognition of RGC's rights, the Merger Agreement provided:

Provisions for the Series A Convertible Preferred Stock. Prior to the Effective Time, [Greka] shall have notified each Holder of Series A Convertible shares of [Old] Saba ... of the provisions it has made for the conversion of said Saba Preferred Shares into Common of [Greka] in accordance with the Saba Preferred Shares designation. [FN13]

FN13. Merger Agreement § 2.1(f) (emphasis added).

F. RGC and Greka Negotiate the Term Sheet

After the issuance of the Proxy Statement on February 19, 1999, RGC and Greka began the negotiations that would lead to the Term Sheet. The parties were clearly running short on time as the stockholder votes on the Merger were set for March 19, 1999, and the Merger was to close the second business day after a successful vote. [FN14]

FN14. Merger Agreement at I-2; Proxy Statement at 37. See Grewal Tr. 33-34 (Greka "definitely [felt] under the gun ").

On February 25, 1999, Greka sent RGC a written proposal offering to exchange RGC's Series A Preferred shares for Greka preferred shares and a promise that RGC would not engage in any activity involving Greka stock, including short or long sales. [FN15] After some discussion between the parties, RGC rejected the proposed exchange and explained in detail why RGC could not accept the proposed restrictions on its short selling. [FN16] RGC then took that opportunity to propose that Greka provide RGC with a secured convertible note that could be structured to give Greka a defined period of time to buy out the Series A Preferred shares using cash. [FN17] RGC also proposed that the note could be converted into common stock of Greka before the note became due subject to certain agreed upon limitations. RGC sent a draft term sheet to Greka on March 3, 1999. [FN18] During this period, Old Saba's problems mounted as Bank One initiated foreclosure proceedings against the company.

FN15. Joint Exhibit 11.

FN16. See Stahlecker Tr. 47-53; Davidson Tr. 347-48.

FN17. See Stahlecker Tr. 53-54; Davidson Tr. 361, 539-40.

FN18. Joint Exhibit 12.

In negotiating the Term Sheet, the parties extensively discussed several important issues including the scope of RGC's market activity in Greka stock. Of particular concern, the parties focused on RGC's ability to engage in short selling. Greka insisted on a flat prohibition of short sales which, it argued, had undermined the value of Old Saba stock in the past. RGC asserted that it needed to engage in short sales in order to protect its investment in the secured convertible note. That is, RGC wanted through short selling to hedge its risk against receiving a large amount of Greka stock.

G. The Term Sheet

On March 15, 1999, four days before the stockholder meeting, RGC, Old Saba, and Greka reached agreement on the detailed Term Sheet. The transaction contemplated therein, the Note Exchange, would require RGC to exchange all of its Series A Preferred shares for a Secured Convertible Note issued by Greka. The Note was to have a value equal to the "aggregate Stated Value of the Series A Preferred Stock owned by RGC plus all accrued and unpaid interest, dividends and registration payments up to the closing date of the exchange." [FN19] Greka agreed to pledge all of its collateral assets to secure the Note (the "Security Provision"). [FN20] As testified to at trial, Greka was not "thrilled" with this provision. [FN21]

FN19. Term Sheet, at 1 (emphasis added). Although the Term Sheet does not precisely define the closing date, it appears that even Grewal expected the Note Exchange to close within a few weeks of the signing of the Term Sheet. See Grewal Tr. 639.

FN20. Term Sheet, at 2. The Security Provision states, "The Note shall be secured by all of the collateral (broadly defined) of [Greka]."

FN21. Davidson Tr. 363-64.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
(Cite as: 2001 WL 984689, *6 (Del.Ch.))

*6 The Term Sheet also states that the directors, officers, and principal shareholders of Greka would enter into lock-up agreements "prohibiting sales (including margin sales), transfers or other dispositions (including pledges)" of Greka stock while the Note is outstanding (the "Lock-Up Provision"). [FN22] The Term Sheet includes provisions concerning the exchange of warrants held by RGC in Old Saba for warrants to purchase shares of Greka stock. Greka agreed as well to file a Form S-3 Registration Statement within twenty days of the closing of the Note Exchange that would cover enough shares to satisfy the possible conversion of the Note and the exercise of the warrants to purchase Greka stock. Additionally, Greka and New Saba agreed "to reimburse RGC for expenses reasonably incurred in connection with the [Note Exchange], including, without limitation, reasonable expenses for attorneys." [FN23]

   FN22. Term Sheet, at 3.

   FN23. Term Sheet, at 4.

The Term Sheet provided that the Note was due to be paid in cash 180 days after the closing date (the "Due Date") for 120% of "the then outstanding principal amount thereof, plus *all* accrued and unpaid interest thereon." [FN24] Greka had the right to prepay at any time prior to the Due Date any portion of the Note "at 104% of the principal amount being prepaid plus accrued interest thereon." [FN25] If Greka prepaid a portion of the Note equal to "(i) the original principal amount of the Note, less (ii) an amount equal to the sum of (A) $500,000, plus (B) the aggregate amount of the registration payments included in the original principal amount of the Note, the balance of the Note shall be forgiven." [FN26] Put simply, if Greka paid approximately $7,000,000 within 180 days, nothing more would be due under the Note.

   FN24. Term Sheet, at 1 (emphasis added).

   FN25. Term Sheet, at 1.

   FN26. Term Sheet, at 1-2.

After much discussion, the parties agreed on a compromise regarding market activity by RGC in Greka stock; RGC agreed not to engage in any activity in Greka stock during the 30-day period in which the conversion price on the Note was to be established. [FN27] The Term Sheet also contains a "Conversion Limitations" section that according to Grewal worked with the initial 30-day market activity prohibition to act as "a practical method of eliminating or deincentivizing one wanting to hedge their positions [sic] through a short sale." [FN28] The "Conversion Limitations" paragraph states that:

   FN27. Term Sheet, at 2.

   FN28. Grewal Tr. 807.

During each 30 day period following the Closing Date (each such period being referred to as a "Conversion Period"), RGC shall be entitled to convert up to a portion of the principal amount of the Note equal to the greater of (i) 20% of the original principal amount thereof and (ii) 20% of the aggregate trading volume of the Common Stock during the 30 trading days ending on the trading day immediately preceding the Conversion Period for which the calculation is being determined. Such amounts shall accumulate each month so that by the 5th month these conversion limitations shall no longer be applicable. The cumulative amount of the Note which is convertible pursuant to the preceding sentences shall be reduced by [Greka] prior to the date of any such conversion. [FN29]

   FN29. Term Sheet, at 2.

*7 Greka contends that this provision effectively allows Greka to prevent "(by paying cash to RGC) any shares of Greka ever coming into the hands of RGC if [RGC] tried to convert to cover its short sales." [FN30]

   FN30. Defs.' Post-Trial Br., at 12.

According to the Term Sheet, the closing of the Note Exchange was subject to certain conditions, including: (1) "[m]utual agreement on definitive documentation," (2) "completion of the merger between [Old] Saba and [Greka]," and (3) "cancellation of the [Series A] Preferred Stock owned by [Greka]." [FN31] The parties expressly *acknowledge[d] their mutual agreement to the above terms [of the Term Sheet] and their intention to negotiate in good faith the contemplated transaction in an expedited manner.* " [FN32]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d                                                                        Page   7
(Cite as: 2001 WL 984689, *7 (Del.Ch.))

FN31. Term Sheet, at 3-4

FN32. Term Sheet, at 4 (emphasis added)

### H. *The Merger Closes While Little Progress Is Made Regarding the Note Exchange*

In keeping with the parties' agreement to agree to definitive documentation in an expedited manner, RGC circulated a draft set of Note Exchange documents to Greka and Old Saba on March 19, 1999. Collectively over ninety pages in length, these draft documents were quite extensive and caught Greka by surprise. [FN33] Greka was immediately concerned as well by the content of these draft documents. [FN34] Although I would characterize this initial set of draft documents as a bit aggressive, they were not commercially unreasonable in view of the fact that the parties had agreed on a convertible note, and not a more straightforward definitive cash buy-out. In particular, I note that *none* of RGC's proposals contradicted a specific provision of the Term Sheet. [FN35] Rather, RGC's first set of draft documents reflected the Term Sheet and supplemented it with implementing provisions.

FN33. Grewal Tr. 641-42, 644; Davidson Tr. 401-04.

FN34. Grewal Tr. 640; Davidson Tr. 440

FN35. At trial, even Greka's lawyer could not recall any terms in the draft documents that were contrary to any provisions in the Term Sheet. *See* Davidson Tr. 406.

On March 22, 1999, the defendants filed the certificate of merger with the Secretary of State's office and the Merger consideration was paid out without any comments on the draft documents having yet been made by Greka or Old Saba. [FN36] RGC assumed that Greka would review the draft documents and return comments quickly. When this did not happen by March 22, RGC attempted to call Greka's counsel, Roger Davidson of the law firm Ballard Spahr Andrews & Ingersoll, LLP to find out the cause of the delay. On March 24, 1999, the Merger closed with RGC having received no comments on the draft definitive documents. RGC was shocked that the Merger had closed without the Term Sheet deal closing contemporaneously. [FN37]

FN36. As filed, the certificate of merger made no provision for the Series A Preferred. Instead, the certificate of merger simply referenced the Merger Agreement, which had only indicated that the Series A Preferred would be informed of how their shares were being converted. Likewise, the certificate of incorporation of the surviving corporation in the Merger, HVAC, which had changed its name to New Saba, made no provision for RGC's Series A Preferred.

FN37. Stahlecker Tr. 113; Marlowe Tr. 313. RGC had expected the Note Exchange and the Merger to close simultaneously. *See* Stahlecker Tr. 70-75; Marlowe Tr. 307-08.

### I. *After the Closing of the Merger, Negotiations Over the Note Exchange Break Down*

The negotiations continued when on March 30, 1999, RGC at last received comments to its proposed documents eleven days after they were sent, and six days after the closing of the Merger. RGC's frustration grew after receiving the comments which they described as "a lazy markup." [FN38] Davidson contends that this first mark-up was "lazy only in the sense it wasn't accompanied by a detailed description of why I had [made certain changes] except for comments in the margin." [FN39] The defendants contend that this markup was "a perfectly appropriate attempt to keep the negotiations moving forward (by making the obvious and most easily implemented changes first) in light of [RGC's attempt] to foist one-sided documents on Greka at the eleventh hour." [FN40] In any case, RGC responded with a slightly revised draft set of documents on April 9, 1999.

FN38. Stahlecker Tr. 117; *see also* Marlowe Tr. 912-14

FN39. Davidson Tr. 569

FN40. Defs.' Post-Trial Br., at 17.

*8 Greka finally responded with detailed, substantive comments to the documents on April 20, 1999, approximately one month after the initial draft documents were sent. This set of comments raised issues that had not previously been raised in Davidson's March 30 mark-up, including objections to the form of the documents themselves, short

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
(Cite as: 2001 WL 984689, *8 (Del.Ch.))

selling covenants, and transferability restrictions. RGC promptly replied in detail to Greka's letter on April 22, 1999. Greka countered fourteen days later with its May 6, 1999 five-point letter (the "Deal Killer Letter").

In the Deal Killer Letter, Greka listed five items that it considered absolutely critical if any final agreement was to be reached between the parties. The five items concerned: (1) the non-negotiability/ non-assignability of the Note; (2) what representations and warranties would be made by Greka as to New Saba's business; (3) Greka's obligation to prepay the Note from asset sales not producing cash; (4) the ability of RGC to engage in market transactions, including short sales of Greka stock; and (5) a confessed judgment provision. The parties made substantial progress in negotiating three of these issues, numbers (1), (2), and (3). [FN41] Even point (5) did not seem likely to terminate the negotiation. Gerald Stahlecker of RGC testified that RGC offered that the confession would only apply at the time of the maturity of the note. According to Stahlecker, although Grewal initially rejected this attempt at compromise, leaving the confessed judgment provision "as an open issue, ... it wasn't going to hold up the transaction." [FN42] But the parties made no progress on RGC's right to engage in short selling. Both parties agree that the real sticking point in the negotiations over the definitive documentation was point (4), the short selling provision. [FN43]

FN41. As to the non-negotiability/non-assignability of the Note, the parties reached a compromise that Grewal found "reasonable" whereby RGC would give Greka a right of first refusal to buy the Note should a third party offer to buy the Note from RGC. See Stahlecker Tr. 135-36; Marlowe Tr. 942-43. On the requested representations and warranties, the parties apparently agreed to "carve-out" or schedule those items to which Greka objected. See Stahlecker Tr. 138-39; Marlowe Tr. 962. Similarly, the parties appeared to have reached a compromise on the prepayment question; 50% of all proceeds that came in the form of cash or marketable securities would have to be paid to RGC. See Stahlecker Tr. 140, Marlow Tr. 955-56; Davidson Tr. 595-96; Grewal Tr. 833-34.

FN42. This point was apparently never actually communicated to Grewal. Stahlecker Tr. 283-86; see

also Marlowe Tr. 966. In any event, given Grewal's behavior, it was hardly unreasonable for RGC to want an easy method of collection in the event Greka breached a clear obligation to pay.

FN43. See February 27, 2001 Oral Argument Tr. at 65. Greka's counsel stated to the court, "Everyone agrees the deal killer was RGC's refusal to give a representation about short selling and our client's insistence that they do so."

The testimony at trial demonstrates that Greka conditioned its agreement to definitive documentation and the completion of the Note Exchange on RGC's agreement not to engage in any market activity in Greka stock, including short selling. [FN44] RGC asserted that Greka was attempting to renegotiate a point that had already been negotiated at length and settled in the Term Sheet. [FN45] RGC therefore refused to renegotiate this point. [FN46] This disagreement over short selling effectively eliminated any chance that the parties would execute definitive documentation and perform the Note Exchange. As a result, RGC began to review with counsel its rights under the Series A Preferred and the Term Sheet.

FN44. See Grewal Tr. 625-630.

FN45. See Stahlecker Tr. 142-46, 229-30; Marlowe Tr. 974-78.

FN46. Id.

During this period when negotiations appeared to be at a standstill, Grewal orally assured RGC that Greka would pay pursuant to the Term Sheet by September 30, 1999. [FN47] In exchange, RGC agreed to hold off on exercising its redemption rights until that date. In a later conversation, Grewal promised that although Greka would not be able to pay RGC as of the end of September, RGC would be paid pursuant to the Term Sheet by November 30, 1999. [FN48] November 30, 1999 came and went without redemption by Greka. Contrary to the testimony of Greka's own attorney, Davidson, Grewal flatly denies having committed Greka to pay RGC a specified amount by a particular date. [FN49] I do not credit Grewal's denial. I believe he led RGC on, in hopes he could put pressure on them to settle on terms that would give Greka a windfall at RGC's expense.



Not Reported in A.2d                                                  Page   9
(Cite as: 2001 WL 984689, *8 (Del.Ch.))

FN47. *See* Stahlecker 148-50; *see also* Davidson Tr.
462 (recounting a conversation in which Grewal told
Davidson that Greka had promised to pay
$7,000,000 to RGC by September 30, 1999)

FN48. *See* Stahlecker Tr. 151-54; Marlowe Tr. 982-
84; Kaminsky Tr. 1075-79

FN49. Defs.' Post-Trial Br., at 28.

*9 On December 1, 1999, RGC attempted to
exercise its Mandatory Redemption rights under the
Certificate of Designations by seeking to collect
over $26,000,000 based on the assumption that the
redemption price would be based on Greka's and not
New Saba's stock trading price. On December 9,
1999, Greka refused to honor this redemption
notice. As a result, RGC brought this lawsuit on
December 15, 1999.

### III. *The Parties' Contentions*
This litigation has already produced two opinions
that dispensed of eight of the nine claims asserted by
RGC and all of Greka's counterclaims. [FN50] In
this post-trial opinion, the Court is therefore left
with the central question described in *Greka I.* That
is, the Court must determine the consequences
flowing from Term Sheet and the parties'
subsequent conduct under it. [FN51]

FN50. *See Greka I*, mem. op. at 45; *Greka II*, mem.
op at 32.

FN51. *Greka I*, mem. op. at 1-2.

RGC argues that Greka breached the Term Sheet in
bad faith by conditioning any agreement to
definitive documentation and the consummation of
the Note Exchange on the prohibition of RGC from
engaging in short sales of Greka stock. RGC bases
its assertion of bad faith on the fact that the Term
Sheet plainly dealt with the short selling issue. RGC
argues that Greka knew it had compromised on this
point before the closing of the Merger and
understood that in attempting to renegotiate this
point, it was in effect purposefully scuttling any
possibility of final agreement between the parties
now that the Merger had successfully closed. The
plaintiffs also point to Greka's failure to negotiate
after the signing of the Term Sheet in an expedited
manner as an independent breach of its obligations
under the Term Sheet. Alternatively, RGC argues

that it is entitled to damages under the doctrine of
promissory estoppel. [FN52]

FN52. As another alternative, RGC contends that the
substantive economic provisions of the Term Sheet
are specific enough to bind Greka to be ordered by
the court to comply with them, regardless of whose
conduct caused the parties not consummate the Note
Exchange. For reasons identified *infra* at pages 36-
38, I do not reach this issue.

RGC therefore asks this Court for damages and a
security interest in Greka equal to the amount Greka
would have owed RGC had Greka given RGC the
Note as specified by the Term Sheet. RGC further
urges this Court to award it prejudgment interest at a
rate several points higher than Greka's cost of
capital or the legal rate, to specifically enforce the
Lock-Up Provision, and to grant it attorneys' fees
reasonably incurred in this litigation.

Greka asserts that RGC has not met its burden of
proving that Greka breached its obligations in bad
faith. Greka also argues that the Term Sheet is
unenforceable as to its substantive terms under the
doctrine of promissory estoppel. As to a possible
remedy, Greka urges the Court to use its equitable
powers, if necessary, to create a remedy based on
the value of RGC's investment in Old Saba at the
time of the Merger. That is, Greka maintains that
RGC may only be entitled to reliance, not
expectancy, damages. Greka further contends that
RGC is in no way entitled to the enforcement of the
Security or Lock-Up Provisions. Greka also argues
against any right of RGC to receive attorneys' fees.

### IV. *Analysis Of Claims*
#### A. *Greka Breached Its Obligations Under the Term Sheet in Bad Faith*
*10 The parties agree that the Term Sheet "once
executed, gave rise to an enforceable obligation on
the part of the signatories to negotiate in good faith
the definitive documentation required to give effect
to the terms of the transaction described therein."
[FN53] The evidence presented at trial demonstrates
that Greka breached this obligation.

FN53. *Greka I*, mem. op. at 33; Pl.'s Opening Post-
Trial Br., at 35; Defs.' Post-Trial Br., at 29

The evidence is clear that the parties extensively
negotiated RGC's right to engage in transactions

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
(Cite as: 2001 WL 984689, *10 (Del.Ch.))

involving Greka securities, specifically including short sales of Greka stock. The earliest written communication concerning what would grow into the Term Sheet, the written proposal from Greka dated February 25, 1999, conditioned a potential exchange of the Series A Preferred stock for preferred stock in Greka on RGC's agreement not to engage in any transactions in Greka securities, including short sales, during any period of time. [FN54] RGC's immediate response was outright rejection of this provision. [FN55] The negotiations progressed towards an exchange of the Series A Preferred shares for a convertible secured debt instrument. [FN56] RGC explicitly informed Greka that it would not agree to language prohibiting transactions involving Greka securities. [FN57]

FN54. Joint Exhibit 11, ¶ 3.

FN55. *See* Stahlecker Tr. 50-51; Davidson Tr. 346-51.

FN56. Stahlecker Tr. 54-56; Davidson Tr. 347-48.

FN57. Stahlecker Tr. 55.

On March 3, 1999, RGC sent Greka the first draft of what would eventually become the signed Term Sheet. Negotiations concerning any short selling prohibition continued to be pivotal to both RGC and Greka. [FN58] The positions of the parties could not have been clearer. RGC "[was] not going to agree to any limitations on [RGC's] ability to conduct sales, whether they be long or short, so long as those sales [were] conducted in compliance with applicable securities laws." [FN59] Greka would not do a deal unless RGC was prohibited from transactions in Greka securities. [FN60] There is no disagreement that: (i) the parties clearly represented their views to each other on this issue, (ii) each party understood the other's position on this issue, (iii) this was a central issue in the negotiations over the Term Sheet, and (iv) this issue had to be addressed if the parties were to agree to sign the Term Sheet.

FN58. Stahlecker Tr. 56-62; Davidson Tr. 355-59.

FN59. Stahlecker Tr. 57.

FN60. Davidson Tr. 358.

The negotiation over the short selling prohibition

was intense. The parties ultimately resolved this issue with an agreement that RGC would not engage in any activity in Greka stock during the 30-day period in which the conversion price of the Note was to be established. [FN61] This compromise was then incorporated into the next draft, dated March 8, 1999, of what would become the Term Sheet. This language remained unchanged in the final executed Term Sheet of March 15, 1999. [FN62] The battle over short selling had been fought and concluded (so RGC reasonably believed) upon the signing of the Term Sheet. [FN63] Even Greka's principal attorney, Mr. Davidson, agreed that the Term Sheet "laid to rest the issue of RGC's trading in Greka's stock." [FN64]

FN61. Stahlecker Tr. 61; Davidson Tr. 358-59.

FN62. Term Sheet, at 2 (stating, specifically, "RGC will agree not to engage in any transaction in the Common Stock prior to the 31st trading day immediately following the Closing Date.")

FN63. Davidson Tr. 358-59.

FN64. Davidson Tr. 359.

After the signing of the Term Sheet and the closing of the Merger, and about one month after RGC sent to Greka the first set of proposed definitive documents, Greka responded on April 20, 1999, at last, with a detailed list of objections. Included among these new objections, Greka demanded that the parties "add a representation and warranty of RGC stating that it will not interfere with the trading markets for Greka Common Stock." [FN65] RGC immediately responded on April 22, 1999, that the scope of RGC's activity in Greka stock had already been negotiated and agreed to in the Term Sheet.

FN65. Joint Exhibit 28, at 4.

*11 The May 6, 1999 Deal Killer Letter reiterated Greka's insistence on renegotiating the short selling prohibition. This time, however, Greka stated that unless RGC agreed not to trade in Greka stock, there would be no deal. In fact, although there were five "deal-killer" points, the short selling issue was the pivotal issue that prevented any possibility of an agreement. As described above, Greka's objections concerning the non-negotiability/non-assignability



Not Reported in A.2d                                                                Page  11
(Cite as: 2001 WL 984689, *11 (Del.Ch.))

of the Note, the representations and warranties to be made by Greka as to New Saba's business, and Greka's requirement to prepay the Note from asset sales not producing cash were or would have been resolved. The parties even progressed on the confessed judgment provision.

Following the Deal Killer Letter, Greka left little doubt that unless RGC reapproached the short selling issue, Greka would never complete the Note Exchange or enter into any definitive documents. According to the testimony of Greka's CEO, Grewal:

Question: It was your position that under no circumstances was Greka going to agree to definitive documentation proposed by RGC, because Greka could never agree to permit short sales by RGC; correct?
Grewal: From a short selling standpoint, yes. [FN66]

FN66. Grewal Tr. 628. *See also* Grewal Tr. 625-26:

Q: Now, in negotiating the definitive documentation in May of 1999, Greka's position on the short selling activities was that it did not want RGC and Greka securities at all and that it was a deal killer if RGC did not agree to that; is that correct?
A: Didn't want them a thousand miles close to our stock, that's right.
Q: It was a deal killer if RGC didn't agree to that?
A: If they didn't come and agree to stop short selling the stock, that was not something I would agree to, yes.
Q: Under no circumstances was Greka going to agree to definitive documentation proposed by RGC, because you would never agree to permit short sales by RGC in the market for Greka; correct?
A: I did not want them to short [Greka] stock, that's right

A finding of "bad faith" is necessarily a fact-intensive inquiry. [FN67] Here, the chain of events begins with the negotiation of the Term Sheet, moves through the signing of the Term Sheet, and concludes with the breakdown in negotiations following the signing of the Term Sheet and the closing of a profitable Merger. Together, these events paint a rather clear picture. RGC and Greka engaged in a thorough negotiation over the vital short selling issue. The parties compromised on that issue and included this compromise in the signed

Term Sheet. Following the signing of the Term Sheet and the closing of the Merger, Greka attempted not only to renegotiate the short selling issue, but conditioned the transaction contemplated by the Term Sheet on this renegotiation.

FN67. *Abex Inc. v. Koll Real Estate Group, Inc.*, Del. Ch., C.A. 13462, mem. op. at 37, Jacobs, V.C. (Dec. 22, 1994).

Greka makes two arguments in defense of its attempt to renegotiate the short selling rights of RGC. First, Greka argues that the Term Sheet, contrary to RGC's assertions, actually gave Greka complete control over the ability of RGC to trade in Greka securities. Greka contends that the Term Sheet contains "a multi-pronged conversion mechanism." [FN68] After the initial 30-day period during which RGC could not engage in market activity in Greka stock and the conversion price became fixed, the "Conversion Limitations" section of the Term Sheet, according to Greka: (i) "restricted the amount of Greka stock that RGC could receive in conversion in any 30 day period thereafter to 20% of the Note"; and (ii) "gave Greka the right to prevent any Greka conversion shares from coming into RGC's hands by paying cash to RGC equal to the amount RGC wished to convert." [FN69] Greka therefore asserts that this carefully crafted provision effectively gave it control over any ability of RGC to engage in a "hedging strategy" because Greka had the absolute right to substitute cash for any shares of common stock that RGC might have used to cover its short sales.

FN68. Defs.' Post-Trial Br. at 39

FN69. *Id.*

*12 This attempt to recast the Term Sheet fails for several reasons. First and most obvious, if Greka actually believed in the effectiveness of the multi-pronged conversion mechanism, Greka had no good faith reason to insist on a specific covenant from RGC in the subsequent negotiations that RGC engage in no short sales, much less describe the lack of such a covenant as a "deal killer." Greka argues that a short selling representation would represent nothing more than "asking to memorialize, in concrete terms, the control it believed it already possessed." [FN70] This need to "memorialize" what Greka argues that it had already achieved in



Not Reported in A.2d
(Cite as: 2001 WL 984689, *12 (Del.Ch.))

the Term Sheet negotiation is puzzling to say the least. This argument presented by Greka is particularly baffling considering that the negotiations broke down as a result of this need to "memorialize" a set of provisions to which the parties had previously agreed.

FN70. Defs.' Post-Trial Br. at 40

Moreover, even assuming that the conversion mechanism acted just as Greka portrays it, RGC still maintained control over its ability to hedge its risk through short selling and still ultimately end up with its desired goal, cash, not Greka stock. [FN71] Greka only retained the right to pay cash, instead of shares of Greka common, should RGC choose to convert according to the prescribed limitations. This is not a prohibition on RGC's right to sell Greka stock short. Further, by the fifth month following the initial 30 day period, the conversion limitations would no longer apply because the 20% per month conversion limitation would accumulate after each month. After five months (plus the initial 30 day period) therefore, RGC could convert all of the Note without a volume limitation. Not coincidentally, the Note was to be due six months after the closing, the same date as the expiration of all the conversion limitations. At the end of six months, either Greka would have prepaid the Note in cash or the Note would be due, payable in cash (assuming RGC did not convert the entire Note). This provision is structured to leave RGC with cash in exchange for the Series A Preferred, not to prevent short selling. [FN72]

FN71. In support of this conclusion concerning RGC's goal in negotiating the Term Sheet, the court notes that RGC pushed for a transaction that would convert the Series A Preferred into a debt obligation (the Note) instead of into preferred shares of Greka as Greka initially suggested, and that RGC agreed to the generous prepayment option only if Greka would pay cash to extinguish the Series A Preferred.

FN72. At oral argument, Greka's counsel tried to argue that Grewal was acting in good faith because he intended to pre-pay the Note promptly and thereby avoid RGC *ever* owning Greka stock. Counsel conceded a major flaw in his argument though: Grewal never offered to sign a note committing Greka to pay off the Note immediately for cash. Instead, Grewal simply had that option. *See*

July 12, 2001 Oral Argument Tr. at 44-45, 66-69. Given Grewal's past behavior under the earlier Option Agreement which was extended without a purchase of RGC's position by Greka, RGC had no basis or duty to trust that Grewal would cause Greka to pre-pay. In the end, counsel's creative attempt to justify Grewal's actions simply reinforces the blatant bad faith with which Grewal acted. Having consummated the Merger, Grewal's goal was simple: try to put off RGC as long as possible until RGC would settle on the cheap.

Second, Greka contends that the discussions between Greka and RGC before the Term Sheet were consistent with Greka's negotiating position that RGC could not engage in the short selling of Greka stock. Greka urges the Court to place tremendous reliance on the meeting between the parties at the Four Seasons that occurred months before the negotiation of the Term Sheet. The Court chooses not to do that for several reasons. First, there is no documentary or testimonial evidence corroborating what Grewal asserts was said at this short meeting over gin and tonics, and I do not credit his version. More importantly though, the parties, months later, engaged in thorough negotiations over the short selling provision where each party clearly understood the other party's position on the short selling issue. There is no way that Greka did not understand that RGC absolutely required the ability to trade in Greka stock. The Term Sheet itself explicitly dealt with this issue as negotiated by the parties. At the time of the signing of the Term Sheet, Greka understood that it had reached a compromise on the short selling issue *no matter what was discussed at the Four Seasons meeting months earlier*. There is no evidence of the alleged Four Seasons accord in the Term Sheet. [FN73] Regardless of what was said at the Four Seasons, the Term Sheet itself is the clearest expression of the parties' respective positions on the short selling issue. Suffice it to say, the Court is unpersuaded by either attempt by Greka to justify its actions during the negotiations following the signing of the Term Sheet.

FN73. Indeed, the Option Agreement agreed to in October 1998 only contains a brief reference to short selling. *See* Option Agreement. at 3 ("RGC agrees that, following the later to occur of (i) the Shareholder Approval Date [when the shareholders of Old Saba vote to approve the issuance of common



shares pursuant to the conversion of the Series A Preferred shares] and (ii) the Effective Date [when the SEC declares the effectiveness of a Form S-1 covering the resale of the shares underlying the Series A Preferred]. it will use its commercially reasonable efforts to unwind the Short Position [of 653,000 shares of Old Saba common stock] ").

**\*13** Under the well-established precedent of this Court, to constitute bad faith, actions by a defendant "must rise to a high level of egregiousness." [FN74] "Actions by a defendant which necessitate judicial intervention to secure a clearly defined and established right" and "actions by a defendant designed to force an opposing party to resort to litigation for the purpose of causing unreasonable delay" are both evidence of bad faith. [FN75] Grewal's conduct clearly meets this standard.

> FN74. *Judge v. City of Rehoboth Beach*, Del. Ch., C.A. 1613. mem. op. at 4. Chandler, V.C. (April 29. 1994)

> FN75. *Abex*, mem. op. at 37.

The attempt here to condition any further progress towards the Note Exchange on a previously contested and compromised point was an unambiguous act of bad faith in breach of the obligations Greka agreed to in the Term Sheet. The appearance of Greka's behavior is worsened by the fact that Grewal clearly understood exactly what he was doing in attempting to renegotiate the short selling compromise. Grewal agreed that Greka's position regarding short selling expressed in the Deal Killer letter "was the absolute same position that Greka had articulated to RGC during the negotiations for the Term Sheet." [FN76] When asked if language prohibiting RGC from trading in Greka securities was not in the Term Sheet because RGC would not agree to such language, Grewal responded:

> FN76. Grewal Tr. 631

[The Term Sheet] and every line item detail negotiations [that] were not administered by me personally. So why's it not in there? I'm not happy that it's not in there, that obviously means they didn't agree to it. I mean, that is something I don't like, but that's life. [FN77]

> FN77. Grewal Tr. 632-33.

This determination of bad faith is buttressed by Greka's failure to negotiate definitive documentation in an expedited manner. This obligation was also expressly agreed to in the Term Sheet. [FN78] Nevertheless, from the moment the parties signed the Term Sheet, the record contains no evidence that supports the contention that Greka attempted to negotiate the Note Exchange on an expedited basis. Instead, the record evidences RGC's expedited efforts to reach a final agreement on the Note Exchange, which were frustrated by Greka's lack of urgency. In particular, I note that RGC provided draft definitive documentation to Greka on March 19, 1999, four days after the signing of the Term Sheet, and five days before the closing of the Merger, but did not receive a thorough response from RGC until just over one month later. The court is mindful that Greka and its counsel was involved in transactions on several fronts, notably in regards to Old Saba's creditors and the Merger. Nevertheless, Greka obligated itself to negotiate the Note Exchange with RGC on an expedited basis and clearly breached that obligation.

> FN78. Term Sheet. at 4

To conclude this section, I note that the parties have engaged in a somewhat confusing debate about whether the Term Sheet is a contract that is enforceable as to its substantive terms, irrespective of the reasons for the parties' failure to reach a final accord on the Note Exchange. I see no reason to enter into this quagmire, which emerges as relevant only if the parties' failure to consummate the Note Exchange did not result from either party's breach of its duty to negotiate in a good faith, expedited manner. Given the highly detailed nature of the Term Sheet, the important commercial circumstances in which it was negotiated, and the fact that the Term Sheet appears in all respects to be a binding contract as to certain promises, I have no difficulty concluding that the Term Sheet gave rise to an enforceable obligation on Greka's part to negotiate in good faith on an expedited basis. Regardless of whether Greka had reserved to itself the right not to consummate the Note Exchange if the parties failed to reach accord on documentation based on a point not covered in the Term Sheet, it had clearly not reserved the right to thwart final agreement by insisting that RGC abandon specific



Not Reported in A.2d
(Cite as: 2001 WL 984689, *13 (Del.Ch.))

provisions of the Term Sheet. [FN79]

> FN79. This is one of several reasons why this case
> is distinguishable from *Transamerican Steamship
> Corp. v. Murphy*, Del. Ch., C.A. No. 10511, let.
> op., Allen, C. (Feb. 14, 1989). *Transamerican*
> involved an alleged *oral* understanding between two
> parties trying to settle an ongoing litigation on
> certain terms. The court held that the supposed oral
> understanding did not create an enforceable contract
> because one party had expressly stated that, "there is
> no deal until there's a signed agreement" and the
> parties never reduced their agreement to a signed
> writing. *Id.*, let. op. at 6. Here, although the Term
> Sheet includes conditions that must be met before the
> consummation of the Note Exchange including
> "mutual agreement on definitive documentation," the
> Term Sheet does not include language that the
> parties explicitly reserved the right not to be bound.
> Rather, these two sophisticated, commercial parties
> "acknowledge[d] their mutual agreement" to the
> terms of the approximately three-and-a-half page,
> singe-spaced Term Sheet. These material terms that
> would form the basis of the Note Exchange included
> agreements as to price, duration, interest,
> prepayment, conversion, security, and registration
> rights. The facts of this case therefore are more
> closely analogous to those of *Asten v. Wangner Sys.
> Corp.*, Del. Ch., C.A. 15617, Steele, V.C. (Sept.
> 23, 1999) (granting specific performance of a written
> settlement agreement that did not omit any material
> terms but left the negotiation of certain implementing
> terms to the future); *Hazen v. Miller*, Del. Ch., C.A.
> No. 1292, let. op., Jacobs, V.C. (Nov. 18, 1991)
> (noting that an agreement to make a contract may be
> specifically enforced if that agreement contains all of
> the material and essential terms to be incorporated
> into the final contract, and if those terms are definite
> and certain).

*14 As noted previously, the parties even went so
far as to state in the Term Sheet that "[t]he parties
hereby acknowledge their mutual agreement to the
above terms." [FN80] At the very least, after
signing the Term Sheet, neither party could in good
faith insist on specific terms that directly
contradicted a specific provision found in the Term
Sheet. In insisting on a renegotiation of RGC's right
to engage in short selling, this is exactly what Greka
did. Even the defendants admit that they are
culpable if their own bad faith breach was the
proximate cause of the parties' failure to agree on

final documentation. [FN81] I have so found, and
have concluded that this bad faith involved a blatant
attempt to force RGC to give up a specifically
negotiated provision in the Term Sheet--a provision
that was already a settled item.

> FN80. Term Sheet, at 4.

> FN81. *See* July 12, 2001 Oral Argument, at 47-48

### B. *In The Alternative, RGC Is Entitled To Damages Under The Doctrine Of Promissory Estoppel*

Thus, I have concluded that Greka breached its duty
to negotiate the Note Exchange in good faith in an
expedited manner. As a result, RGC is entitled to
relief for injury caused by this breach. In the
alternative, RGC contends it is entitled to damages
under the doctrine of promissory estoppel. As noted
in *Greka I*, a plaintiff may obtain relief under this
doctrine where:
i) a promise was made;
ii) it was the reasonable expectation of the promisor
to induce action or forbearance on the part of the
promisee;
iii) the promisee reasonably relied on the promise
and took action to his detriment; and
iv) such promise is binding because injustice can be
avoided only by enforcement of the promise.
[FN82]

> FN82. *Greka I*, mem. op. at 34 (citing *Lord v.
> Souder*, Del. Supr., 748 A.2d 393, 399 (2000)).

The elements of promissory estoppel have been met
here. As noted in *Greka I*, RGC refrained from
exercising its Mandatory Redemption Rights or
Conversion Rights before the Merger because it
reasonably relied to its detriment on the promises
contained in the Term Sheet. Greka entered into the
Term Sheet knowing that without it, the profitable
Merger with Old Saba could not have been
consummated in the manner it was. After the
Merger closed, the Note Exchange contemplated by
the Term Sheet did not occur. Although Greka
received all of its intended consideration that
followed from the Term Sheet, namely the closing
of the Merger and the resulting financial rewards
that accrued to Greka, RGC received nothing.
[FN83] Thus, RGC was subjected to the type of
injustice the doctrine of promissory estoppel is
intended to prevent.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
(Cite as: 2001 WL 984689, *14 (Del.Ch.))

FN83. RGC had agreed to accompany Greka to the end of the rainbow, only to discover that Greka had taken the pot of gold for itself.

## V. Damages

### A. RGC Should Receive Its "Expectation Interest"

For the reasons discussed above, Greka has been found in breach of its obligation to negotiate in good faith *and* liable under the doctrine of promissory estoppel. The question has therefore become not whether RGC is entitled to a remedy, but what the appropriate nature of that remedy should be. In anticipation of this dilemma, the parties have hotly contested the nature of the remedy to be awarded to RGC. RGC argues that it is entitled to damages and security in the amount Greka would have owed it had the parties entered into the Note Exchange in a timely manner. Greka attempts to define the argument as one between awarding RGC its expectancy interest as opposed to its reliance interest in signing the Term Sheet and foregoing its right to participate in the Merger.

*15 Greka asserts that:

[W]hether the Court derives an equitable remedy here based on promissory estoppel or on account of [the Term Sheet], we respectfully submit that it should carefully craft such remedy only to the extent needed to prevent injustice--not to create a windfall for RGC for its devalued preferred shares. Thus, RGC should be compensated for what it actually "gave up" in reliance, *not* as it seeks, [its expectancy interest that] it might theoretically have received if the Term Sheet were the Note itself, all of its terms were as RGC alleges, and Greka defaulted on all its obligations thereunder. [FN84]

FN84. Defs.' Post-Trial Br., at 46. In attempting to calculate RGC's reliance interest in signing the Term Sheet, Greka argues that a ceiling must be set at $6,600,000 as "Greka's willingness to pay *and* RGC's willingness to accept* $6.6 million proves that justice cannot require any higher award." *See* Defs.' Post-Trial Br., at 47. If this were the case though, one must wonder why this litigation has proceeded for two years, resulting in a full trial and now a third judicial opinion. Either RGC was not willing to pay $6,600,000 in cash to RGC or RGC was not willing to accept it. The former is obviously the reality.

Among the problems facing Greka in constructing its argument, this is not a case where two parties who signed a term sheet simply could not in good faith agree on how to consummate the contemplated transaction. Rather, Greka, in bad faith, conditioned the Note Exchange on the renegotiation of a material term that it had previously reached a compromise on and knew RGC would never renegotiate. Greka, in bad faith, purposefully took a position which it knew would prevent any chance of the completion of the Note Exchange in hopes that it could force RGC to renegotiate the short selling provision that Greka had previously agreed to. This action is a direct breach of the *contractual* obligation Greka entered into to negotiate towards the Note Exchange in good faith. Greka is in no position to argue that the damages RGC suffered because of its bad faith refusal to consummate the Note Exchange are somehow less than if Greka had consummated the Exchange and then refused to pay off the Note when due.

Moreover, this is a case where Greka has received *all* of the consideration it bargained for during the negotiations of the Term Sheet. That is, Greka closed on its profitable Merger with Old Saba, a transaction that would not have been possible absent some agreement with RGC. After the Merger closed, Greka had no incentive to pursue the Note Exchange, and in bad faith, took action that it knew would likely endanger any possibility of the consummation of the Note Exchange unless RGC changed a position that it had consistently and repeatedly advocated throughout its entire relationship with Greka.

Finally, the doctrine of promissory estoppel as applied in Delaware does not require an award of damages to be limited to a party's reliance interest. As the Delaware Supreme Court noted in its landmark 1958 decision in *Chrysler Corp. v. Quimby,* "[t]here appears to be considerable uncertainty in the decisions respecting the correct rule of damages in promissory estoppel cases. The doctrine, at bottom, embodies the fundamental idea of the prevention of injustice." [FN85] As noted by Chief Justice Southerland, damages in these cases have, among other possibilities, "secured for the promisee the expectancy or its value." [FN86] If the facts of a case so merit, a plaintiff may recovery its expectation interest from a recovery of damages in a promissory estoppel case. [FN87]

FN85. Del.Supr., 144 A.2d 123, 133 (1958). *aff'd*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
(Cite as: 2001 WL 984689, *15 (Del.Ch.))

*on rehearing,* 144 A.2d 885 (cited in the Reporter's note to the Restatement (Second) of Contracts § 90).

FN86 *Id.* at 133-34 (quoting Fuller and Perdue, *The Reliance Interest in Contract Damages* 46 Yale L.J. 373, 405 (1936)).

FN87 *Id.* at 134; *see also* 3 Eric Mills Holmes, *Corbin on Contracts* § 8.8, at 21 (Joseph M. Perillo ed., rev. ed. 1996) ("[In promissory estoppel cases], the court can give judgment for expectation damages measured by the value of the promised performance."); *id.*, § 8.12, at 101-03; Daniel A. Farber & John H. Matheson, *Beyond Promissory Estoppel: Contract Law and the 'Invisible Handshake',* 52 U. Chi. L. Rev. 903, 909-10 (1985) ("[R]ecent cases are heavily weighted towards the award of full expectation damages ... Courts are also willing to grant equitable remedies, such as specific performance or injunctive relief, in cases decided on a promissory estoppel theory."); Jay Feinman, *Promissory Estoppel and Judicial Method,* 97 Harv. L. Rev. 678, 687-88 (1984) ("[T]he typical damage remedy in promissory estoppel cases is measured by the expectation interest ... [I]n business cases, expectation recovery may better reflect opportunity losses than would reliance recovery.").

*16 Greka's argument is particularly tenuous here where RGC has not asked this Court to grant it an indeterminable estimation of future profits. Rather, RGC asks only to be awarded "exactly *what* Greka agreed to give RGC in the written Term Sheet (money and security), exactly *when* Greka should have given it, and at the rate (120% of principal) that Greka agreed [to] pay it." [FN88] In determining the amount of damages to award, the Court is guided not by speculation, but by how the parties themselves agreed to value Greka's obligations to RGC as embodied in the Term Sheet. Put another way, the best measure of what RGC gave up (*i.e.*, its lost reliance interest) is the price that these two aggressive adversaries put on it after arms-length bargaining. Based on the facts of this case, where Greka breached its obligation to negotiate in good faith *and* RGC reasonably relied on the promises made by Greka and thereby took action to its detriment, the court may award damages and security in the amount equal to what RGC should have received if the Note Exchange had been consummated.

FN88 Pl.'s Rep. Post-Trial Br. at 19. For example, RGC has not asked this Court to speculatively award it damages based on if RGC had converted some or all of the Note into Greka shares, or if RGC had invested the proceeds from the Note in a profitable business opportunity.

B. *The Damages Calculation*

Although the parties largely agree on the structure of the calculation that must be used to determine what RGC is owed under the Term Sheet, Greka asserts the presence of several mistaken assumptions that may misinform the result. As a starting point, the Term Sheet provides:

The Note shall be due in cash on the 180th day following the Closing Date (the "Due Date"). On the Due Date, [Greka] shall be obligated to pay to RGC an amount in cash equal to 120% of the then outstanding principal amount thereof, plus all accrued and unpaid interest thereon in full satisfaction of the Note. [FN89]

FN89 Term Sheet. at 1.

First, Greka contends that the damages calculation must take into account that Greka would have prepaid the amount due under the Note had the Note been signed. Under the Term Sheet, Greka was entitled to prepay any portion of the Note at any time at 104% of the principal amount being prepaid plus all accrued interest thereon. Simply put, there is no basis to conclude that Greka would have prepaid the Note, especially given the pattern of bad faith evidenced during the negotiations following the signing of the Term Sheet. Besides the bad faith breach discussed above, Grewal promised to pay approximately $7,000,000 to RGC by September 30, 1999. This promise to pay and a subsequent promise to pay by November 30, 1999 were not kept. Also, Greka never had the cash on hand to prepay the Note had it been outstanding. Greka insists though it "had the means to secure funds to pay RGC within 180 days of signing definitive documents." [FN90] This is pure conjecture and speculation, especially considering the promises to pay RGC in September and November 1999.

FN90 Defs.' Post-Trial Br. at 52.

Further, to allow Greka to pay off its obligations at the prepayment interest rate would effectively rewrite the terms of the Note. This was a 180-day

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
(Cite as: 2001 WL 984689, *16 (Del.Ch.))

debt instrument where the borrower (Greka) was obligated to pay the lender (RGC) 120% of principal plus interest when the debt was due. Greka's attempt to convert its *obligation* to pay back the Note using *rights it may not have been able to exercise* is entirely without merit.

*17 Second, Greka argues that it should not be responsible for paying: (i) registration payments outstanding for failure to register the Old Saba Series A Preferred, and (ii) accrued interest and dividends owed on the Old Saba stock. There is no dispute that these obligations were outstanding as of the date the parties entered the Term Sheet. The Term Sheet itself provides that the Note shall have "an aggregate principal amount equal to ... the aggregate Stated Value of the Series A Preferred Stock owned by RGC plus all accrued and unpaid interest, dividends and registration payments up to the closing date of the [Note Exchange]." [FN91] This language is clear on its face that Greka agreed to include the Old Saba registration payments, accrued interest and dividends in the Note. Any attempt to cloud the Note's plain meaning is without merit.

FN91. Term Sheet. at 1.

Lastly, Greka contends that it should not be made to pay any penalties for failure to register the Greka stock that RGC may have received through conversion or by exercising warrants. Greka points out that it had begun the registration process by April 1999 and that Greka did, in fact, register shares in 1999. [FN92] I therefore conclude that the evidence supports Greka's intention to register these shares of Greka stock had the Note Exchange been consummated. In an exercise of remedial discretion, registration payments and penalties relating to these Greka shares (as opposed to registration payments related to the Series A Preferred) will not be included in the damage award.

FN92. Stahlecker Tr. 250-51; Davidson Tr. 520.

C. *The Lock-Up and Security Provisions*
The parties dispute whether RGC is entitled to specific performance of the Lock-Up Provision. The Term Sheet states:
   The directors, officers and principal shareholders (including Capco ...) of [Greka] will enter into lock-ups prohibiting sales (including margin sales),

transfers or other dispositions (including pledges) of Common Stock while the Note is outstanding. [FN93]

   FN93. Term Sheet. at 3.

This provision would effectively prevent any directors, officers, or principal shareholders to be able to sell their stock to any person or entity until RGC was paid in full on the Note. The negotiation over this provision favorable to RGC was not a sticking point between the parties. [FN94]

   FN94. Davidson Tr. 367.

Another key aspect of the proposed Note Exchange was that RGC would be a secured creditor. [FN95] That fact is not in dispute. The Term Sheet plainly states, "[t]he Note shall be secured by all collateral (broadly defined) of [Greka]." [FN96] Greka would have this Court convert RGC into an unsecured judgement creditor. Under the facts of this case, that would not be appropriate.

   FN95. *See* Stahlecker Tr. 66-69, 99-100. Davidson Tr. 364-67.

   FN96. Term Sheet. at 2.

Due either to Greka's bad faith breach or under the doctrine of promissory estoppel, the Court has the power to enforce these important provisions against Greka. [FN97] Enforcement of the terms of the Term Sheet as written is mandated and proper, but Greka has argued that the Court should deny specific performance of the Security and Lock-Up Provisions on the grounds that Greka has the present ability to pay a judgment in this matter. Because specific performance might be unduly burdensome to Greka as an operating company, I will give it an opportunity to comply with the judgment of this Court by consummating a prompt financing transaction to pay the judgment. With that in mind, the Court will give Greka a reasonable period of time, sixty days from the issuance of this opinion, to tender payment in full of all damages including prejudgment interest and attorneys' fees assessed herein. If Greka does not pay RGC within sixty days, the court's final order will provide for the immediate enforcement of the Security Provision of the Term Sheet. The judgment will then become a fully secured, joint and several obligation of Greka

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



and New Saba. I see no comparable reason, however, to delay the enforcement of the Lock-Up Provision. The Lock-Up Provision will be specifically enforced as of the date of this judgment, and will only be released upon full payment of the judgment assessed herein, including attorneys' fees.

> FN97. *Branca v. Branca,* Del Supr., 443 A.2d 929, 931 (1982) ("[I]n the usual case an equitable lien is impressed to reflect an express agreement that the property to be liened was intended to be held as security for the obligation of the promisor."); *see also Acacia Mut. Life Ins. Co. v. Newcomb,* Del. Ch., 21 A.2d 723, 724 (1941) ("[I]n most cases. an equitable lien on a particular fund can be created only by a contract which, in express terms, provides that it shall be held or transferred as security for some debt or obligation of the promisor." (citations omitted))

### D. *Prejudgment Interest*

*18 The awarding of prejudgment interest is entirely at the discretion of this Court. [FN98] Such an award is appropriate here as a result of Greka's breaches of its obligations under the Term Sheet. The legal rate of interest is a benchmark for the Court of Chancery, which can be deviated from in this court's discretion. [FN99] The legal rate is equal to the Federal Discount Rate plus 5%. [FN100] I see no reason to depart from that rate here. [FN101]

> FN98. *Gaffin v. Teledyne,* Del Supr., 611 A.2d 467, 476 (1992).

> FN99. *Cole v. Kershaw,* Del. Ch., C.A. No. 13904, let. op. at 8, Jacobs, V.C. (Mar. 30, 2001)

> FN100. *See 6 Del. C.* § 2301

> FN101. Because I have fashioned a damages and attorneys' fee remedy that seems to take away any benefit to Greka from its earlier refusal to pay. I see no reason to increase the legal rate. But I do note that any lesser award of damages will reward Greka, by turning its breach into an efficient one that would result in Greka having been able to hold RGC's money hostage and to use it at a cost of interest less than Greka's own borrowing rate.

Greka contends that if the Term Sheet is enforceable, prejudgment interest should be awarded

at the 6% rate called for therein. Greka's argument is misplaced. The Term Sheet states, "The Note shall bear interest at the rate of 6% per annum payable in cash *at maturity, redemption or prepayment* or in common stock of [Greka] ... upon conversion of the Note." [FN102] The Note contemplated by the Term Sheet was not structured to be an indefinite loan, but rather a finite, six-month obligation with a 6% interest rate. That rate was only to apply for the life of the Note. Whether the Note fully matured or RGC exercised its conversion rights or Greka prepaid its obligation, under no circumstances could the Note remain outstanding after the passing of 180 days (unless the parties renegotiated). The 6% interest rate therefore has no relevancy in determining the rate of prejudgment interest to be applied after the expiration of the 180-day maturation period.

> FN102. Term Sheet, at 1 (emphasis added).

To calculate the appropriate rate of prejudgment interest, the Court must first determine when prejudgment interest began to accrue. According to Grewal, the parties had a "collective understanding" that they would be executing the definitive documentation in "two to three weeks" following the signing of the Term Sheet. [FN103] In performing the damages calculation, the Court will therefore assume that the definitive documentation would have been signed on April 7, 1999, two weeks after the closing of the Merger and just over three weeks after the signing of the Term Sheet. Prejudgment interest will be awarded beginning on October 4, 1999, 180 days after April 7, 1999. From April 7, 1999, to October 4, 1999, RGC is entitled to the 6% interest rate agreed to in the Term Sheet. From October 4 until the date of the issuance of this opinion, RGC shall receive prejudgment interest as determined by averaging the composite Federal Discount Rate for 2000 (5.73%) with the average Discount Rate of each month from October 1999 to December 1999 and from January 2001 through July 2001. [FN104] Following this method, I arrived at a prejudgment interest rate of 5% plus 5.16%, equaling 10.16%.

> FN103. Grewal Tr. 639.

> FN104. The months and their corresponding composite Discount Rates are: 10/1999. 4.75%; 11/ 1999, 4.86%; 12/1999, 5.00%; 1/2001, 5.52%; 2/

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d                                        Page  19
(Cite as: 2001 WL 984689, *18 (Del.Ch.))

2001. 5.00%; 3/2001, 4.81%; 4/2001. 4.28%; 5/
2001. 3.73%; 6/2001. 3.47%; 7/2001, 3.25%  The
monthly figures are available online at http://
www.federalreserve.gov/releases/H15/data/m/
dwb.txt  Yearly figures are available at htt p://
www.federalreserve.gov/releases/H15/data/a/
dwb.txt

     E. *The Damage Award*
The complete damages calculation is as follows:

```
---------------------------------------------------------------------------
"Closing Date"                                          4/7/99
---------------------------------------------------------------------------


---------------------------------------------------------------------------
Aggregate Principal Amount of Note pursuant to Term Sheet
  equals "Preferred Stock Value" which equals aggregate Stated
  Value of Series A Preferred Stock + Registration Payments +
  all accrued and unpaid interests and dividends
---------------------------------------------------------------------------


---------------------------------------------------------------------------
Preferred Shares owned by RGC (7,159.3)                    7,159.30
---------------------------------------------------------------------------
Aggregate Stated Value of Series A Preferred Stock (7,159.3   $  7,159,300.00
  * $1,000)
---------------------------------------------------------------------------
Accrual Date of Preferred Stock (December 31, 1997)        31--Dec--97
---------------------------------------------------------------------------
Number of Accrual Days from December 1997 to "Closing Date"      462
---------------------------------------------------------------------------
Interest Rate on Preferred Stock (6%)                          6%
---------------------------------------------------------------------------
Accrued and unpaid interest and dividends on Preferred Stock   $    543,714.51
---------------------------------------------------------------------------
Registration Payments (capped at 10% of Stated Value of      $    715,930.00
  Preferred Stock)
---------------------------------------------------------------------------


---------------------------------------------------------------------------
Principal Amount of Note (Stated Value + Registration Payments $  8,418,944.51
  + Accrued Interest) at "Closing Date"
---------------------------------------------------------------------------


---------------------------------------------------------------------------
Maturity Calculations: 120% of Principal + 6% Accrued Interest
  due at Maturity (180 days) under Note
---------------------------------------------------------------------------


---------------------------------------------------------------------------
Accrual Date ("Closing Date")                               4/7/99
```

℗ 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A 2d
(Cite as: 2001 WL 984689, *18 (Del.Ch.))

```
-------------------------------------------------------------------------
Maturity Date 180 Days Later ("Due Date")                         10/4/99
-------------------------------------------------------------------------


-------------------------------------------------------------------------
120% of Principal Amount Calculation:
-------------------------------------------------------------------------
Principal at Maturity (at "Due Date")                  $   8,418,944.51
                                                                  120%
-------------------------------------------------------------------------
-------------------------------------------------------------------------
120% of the Outstanding Principal Amount at Maturity (at "Due  $ 10,102,733.41
   Date")
-------------------------------------------------------------------------
-------------------------------------------------------------------------


-------------------------------------------------------------------------
Interest Calculation on Principal for 6 months
-------------------------------------------------------------------------
Principal at Issuance (at "Closing Date")              $   8,418,944.51
-------------------------------------------------------------------------
Interest Rate                                                        6%
-------------------------------------------------------------------------
Accrual Days                                                        180
-------------------------------------------------------------------------
-------------------------------------------------------------------------


-------------------------------------------------------------------------
Accrued Interest on Principal                          $     249,108.50
-------------------------------------------------------------------------


-------------------------------------------------------------------------
Maturity Value (120% Outstanding Principal at maturity +  $ 10,351,841.91
   Accrued Interest)
-------------------------------------------------------------------------
-------------------------------------------------------------------------


-------------------------------------------------------------------------
Fed Discount Rate Average From "Due Date"                         5.16%
-------------------------------------------------------------------------
                                                                  5.00%
-------------------------------------------------------------------------
-------------------------------------------------------------------------
Legal Rate of Interest (6 Del. C. 2301) (Fed Discount Rate +     10.16%
   5%)
-------------------------------------------------------------------------
-------------------------------------------------------------------------


-------------------------------------------------------------------------
Estimated date of payment by Greka                                8/22/01
-------------------------------------------------------------------------
Accrual Days ("Due Date"--Estimated date of payment by Greka)        748
```

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



| | |
|---|---|
| Accrued Pre-judgment Interest through Estimated date of payment by Greka | $  2,155,361.26 |

| | |
|---|---|
| Amount due on August 22, 2001 | $ 12,507,203.17 |

**\*19** The total damages including prejudgment interest owed by Greka to RGC equals $12,507,203.17.

### VI. *Attorneys' Fees*

RGC maintains that it is entitled to reimbursement of its attorneys' fees reasonably incurred pursuant either to a specific provision in the Term Sheet or under the equitable discretion of this Court.

The Term Sheet states:

*Whether or not the transaction closes,* [Greka] agree[s] to reimburse RGC *for all expenses* reasonably incurred by it in connection with the transaction contemplated hereby, *including, without limitation, reasonable expenses for attorneys.* [FN105]

FN105. Term Sheet, at 4 (emphasis added).

Although the plain language of this provision supports RGC's request for its attorneys' fees, Greka argues that the provision does not include any reference to litigation related expenses. [FN106] However, this provision expressly contemplates the reimbursement of *all* expenses including those for attorneys. [FN107] If the parties had wanted to exclude litigation expenses from the broad wording of this provision, they could easily have specified that. Greka essentially argues that this broad provision does not cover expenses RGC incurred in enforcing rights that Greka deprived it of in bad faith. Greka's position is untenable. RGC gave it many chances and much time to live up to its duties without litigation. What is "reasonable" depends on the circumstances. Having been stiffed by Grewal time and again, it was perfectly reasonable for RGC to seek to consummate the Note Exchange it deserved through the court system. These fees reasonably incurred by RGC are covered by the applicable Term Sheet provision.

FN106. Greka does not argue that this provision of the Term Sheet did not create an enforceable obligation. *See* July 12, 2001 Oral Argument Tr. at 78-80.

FN107. *See Northwestern Nat'l Ins. Co. v. Esmark,* Del.Supr., 672 A.2d 41, 44 (1996) (noting that interpretations of agreements that attempt to add limitations not found in the plain language of the contract are untenable).

Alternatively, it is within this Court's equitable discretion to award attorneys' fees as costs under 10 *Del.C.* § 5106 and Court of Chancery Rule 54(d). [FN108] Although, typically, each party to a litigation must bear its own litigation expenses under the "American Rule", "this Court has the power to award attorneys' fees where the party against whom the fees are assessed has acted, *inter alia,* in bad faith or vexatiously." [FN109] For example, in *Stone v. Hungerford,* [FN110] Vice Chancellor (now Justice) Steele granted plaintiffs' petition for costs and reasonable attorneys' fees under the bad faith exception to the American Rule where the defendant resorted to burdensome and protracted litigation in hopes of discouraging the plaintiffs from enforcing their contractual rights despite the indefensibility of the defendant's legal position. Similarly, here, RGC was forced by Greka's bad faith conduct to litigate to consummate the transaction contemplated in the Term Sheet. In so concluding, I specifically find that Grewal purposefully stiffed RGC in the post-Merger negotiation process in order to try to force RGC to settle for pennies on the dollar. This litigation would not have been necessary if Grewal had behaved in a minimally responsible fashion. And Greka could have paid RGC far less than it will have to now, if its CEO had not acted with such obstinancy. [FN111] The awarding of attorneys' fees to RGC is therefore warranted under the "bad faith" exception

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
(Cite as: 2001 WL 984689, *19 (Del.Ch.))

to the American Rule as well.

> FN108. *In re Charles Wm. Smith Trust*, Del. Ch.,
> C.A. No. 16902, mem. op. at 5, Jacobs, V.C. (July
> 23, 1999).

> FN109. *Abex*, mem. op. at 37; *see also Johnston v.
> Arbitrium (Cayman Islands) Handels*. Del.Supr., 720
> A.2d 542, 546 (1998).

> FN110. Del. Ch., C.A. 14494, let. op. at 5-6.
> Steele, V.C. (July 25, 1997).

> FN111. Without delving too deeply into this subject,
> it is also the case that Greka has advanced a
> bewildering array of "theories" to justify Grewal's
> misconduct. These theories, to be charitable, had
> minimal grounding in fact or law, and made this
> litigation more expensive than it should have been. I
> also note that Grewal's conduct related to this
> litigation involved the filing of false affidavits to
> another court regarding his availability to participate
> in proceedings in that other forum, a fact that
> contributed to my decision to give little credit to his
> testimony.

 *20 Nevertheless, RGC may not recover for all of
its fees incurred with respect to this litigation. There
are two sets of claims for which RGC may recover
all of its attorneys' fees from Greka: (i) all fees
related to the successful Term Sheet Claims, and (ii)
all fees related to its defense (and resulting
dismissal) of the short selling counterclaims filed by
Greka. But RGC may not recover for its attorneys'
fees incurred in connection with the eight counts
dismissed in *Greka I.*

### VII. CONCLUSION

 For all the foregoing reasons, judgment is therefore
entered in favor of RGC for $12,507,203.17 (which
includes the award of pre-judgment interest). RGC
is also awarded its reasonable attorneys' fees as
specified herein. The parties shall present a
conforming order within ten days of today, and
report on whether they have agreed on a sum to
resolve plaintiffs' entitlement to attorneys' fees.

 Not Reported in A.2d, 2001 WL 984689
(Del.Ch.), 27 Del. J. Corp. L. 955

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# EXHIBIT C

**Westlaw.**

Not Reported in A.2d                                                                     Page 1
Not Reported in A.2d, 1997 WL 441192 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

**H**
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
Re: STONE
v.
HUNGERFORD
**No. 14494-NC.**

July 25, 1997.

Alan J. Stone, Morris, Nichols, Arsht & Tunnell,
Wilmington, DE, David J. Margules, Wolf, Block,
Schorr and Solis-Cohen, Wilmington, DE, Grover C.
Brown, Morris, James, Hitchens & Williams,
Wilmington, DE.

Submitted:  March 19, 1997

Counsel:

*1 At the conclusion of oral argument on plaintiffs'
petition for costs and attorneys fees against four of
the individual defendant directors, I denied the
petition directed to defendants Reissen and Sarsfield
and reserved decision regarding an award against the
other two individual defendants.   A review of the
circumstances leading up to and including the trial of
this case convinces me plaintiffs' petition must be
granted as to defendant Hungerford, and denied as to
defendant Millar.   The parties' familiarity with the
case eliminates the need for recitation of the factual
and procedural background, and so I proceed directly
to a brief discussion of the law and facts supporting
my conclusion.   FN1

> FN1. The factual and procedural background
> is fully set forth in *Stone v. Hungerford*, Del.
> Ch., C.A. No. 14494, Steele, V.C. (Feb. 9,
> 1996), Mem. Op ("*Stone I*")

Discussion

Four exceptions have developed to the well-known
American Rule that each side bears its own litigation
expenses:  1) if specifically provided by statute;  2)
where a common fund is created from which the fees

may be paid;  3) where the conduct giving rise to the
litigation is sufficiently reprehensible;  and, 4) if the
suit is brought or the litigation is conducted in bad
faith.FN2   It is the last of these exceptions that is the
focus of the current petition and which the conduct of
defendants Hungerford and Millar allegedly supports.

> FN2. *See Barrows v. Bowen,* Del. Ch., C.A.
> No. 1454-S, Allen, C. (Sept. 7, 1994) Mem.
> Op, 1994 WL 514868 (including citation to
> examples of each of the exceptions).

While it is true that conduct warranting a departure
from the usual rule must be extraordinary and
egregious,FN3 it has not infrequently been the case
that the exception has been argued and accepted
where one forces another to seek legal recourse to
secure an inarguable right.FN4   In such circumstances
a party's bad faith may be evident not only in the
events leading up to institution of the action, but also
in its conduct during the course of the litigation.FN5

> FN3. *Judge v City of Rehoboth Beach,* Del.
> Ch., C.A. No. 1613-S, Chandler, V.C., (Apr.
> 29, 1994), Mem. Op.;   1994 WL 198700
> *Weinberger v. UOP, Inc.,* Del. Ch., 517
> A.2d 653, 656 (1984).

> FN4. *See, e.g., Abex Inc. v Koll Real Estate
> Group, Inc.,* Del. Ch., C.A. No. 13462-NC,
> Jacobs, V.C. (Dec. 22, 1994), Mem. Op.,
> 1994 WL 728827 at *20;   *Judge, supra,
> Loretto Literary & Benev.   Inst. v. Blue
> Diamond Coal Co.,* Del. Ch., 444 A.2d 256
> (1982).

> FN5. *See, e.g., Arbitrium (Cayman Islands)
> Handels AG v Johnston,* Del. Ch., C.A. No.
> 13506, Jacobs, V.C. (May 27, 1997), Mem.
> Op., 1997 WL 294426.

In this action, Hungerford's testimony confirms the
propriety of an award against him.   The testimony at
trial showed clearly that he was aware of AMC's
rights *vis à vis* Millar's shares, did not in any way
dispute the validity of those rights, and yet he
determined to force AMC to litigate or "pay [him] a
lot of money" in order to remove him as an obstacle
to the exercise of these rights.FN6   After forcing

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 2
Not Reported in A.2d, 1997 WL 441192 (Del.Ch.)
(Cite as: Not Reported in A.2d)

plaintiffs to file this action to enforce their contractual rights, and despite the indefensibility of their legal position, Hungerford and Millar raised a number of equitable defenses. Each of these necessitated significant discovery and all were later unceremoniously abandoned.[FN7] Before the trial, I found Hungerford in contempt of a *status quo* order and awarded plaintiffs the costs and fees incurred in connection with their motion to enforce the order. During the trial, I found defendants' arguments to "lack[] credibility in fact and persuasiveness after analysis."[FN8]

> FN6. Both Hungerford and Millar testified they were fully aware of AMC's rights under the pledge agreement, yet Hungerford testified AMC "would have to pay [him] a lot of money" before he would release Millar from their agreements. *Stone I, supra,* at 6, 12. Hungerford took this position despite his knowledge of Millar's pledge agreement with AMC, and despite the fact that his agreements with Millar were expressly conditioned on AMC's approval *Stone I, supra,* at 5.

> FN7. *See, e.g.,* trial transcript at 235-36, 242.

> FN8. *Stone I, supra,* at 11.

All of the actions demonstrate an intentional abuse of judicial process particularly deserving of the sanction here under discussion. Nonetheless, this Court has wide discretion is determining whether to impose such an award.[FN9] In this instance, I exercise my discretion to exempt Millar from this sanction. Millar's live testimony reinforced my impression from the beginning that Millar's view of the best interests of his company motivated his actions. Recognizing management's chaotic state, Millar believed the best interest of all shareholders required him to turn control over to Mr. Hungerford. Nonetheless, he conditioned his agreements with Hungerford on AMC's approval. As it turned out, Hungerford was unwilling to live up to that condition. Millar then made what must be considered the imprudent decision to stand by Hungerford, on whom he pinned his hopes for the company, rather than face up to his agreements with AMC. Perhaps Millar ought to have known better, more carefully considered his course of action, and acted more prudently. But I cannot conclude, based upon my knowledge of the facts and my observations

during Millar's testimony before me, that Millar's conduct rises to the level of bad faith.

> FN9. *Burrows, supra,* at 1; 10 *Del. C.* § 5706 (1974).

*2 By contrast, I do so find with respect to Hungerford. At every turn, Hungerford has evidenced a complete and utter disregard for anything but his own personal gain. Despite his knowledge of Millar's agreements with AMC, and the conditioning of his own agreements on their approval, he refused to act in a manner consistent with their plain and unambiguous meaning. Instead, he resorted to an extortionate demand, gambling AMC would rather purchase his legally indefensible interest in the company or merely acquiesce to his wishes than seek to enforce their rights. Hungerford lost that gamble but chose to roll again, perhaps hoping that the threat of burdensome and protracted litigation would discourage AMC. He lost that gamble as well. The further this case progressed, the more apparent became Hungerford's true colors. Such obvious subversion of the judicial process cannot go without appropriate sanction.

In May of 1996 I granted Hungerford's prior counsel's motion to withdraw. Since that time Hungerford has not appeared, individually or by representative, to make any challenge to this petition. Therefore, with the exception of the amounts voluntarily eliminated from the petition in their reply brief and at oral argument, plaintiffs' petition is granted. I find the amounts requested therein to be reasonable and consistent with the apparent time and effort necessarily expended by experienced counsel in the successful prosecution of this or similar actions.

### Conclusion

Counsel's petition for costs and attorneys' fees is *granted* against Hungerford, but *denied* against Millar. Plaintiffs' counsel is directed to submit an order consistent with the more particular conclusions set forth above.

IT IS SO ORDERED.

Del.Ch.,1997.
In re Stone v. Hungerford
Not Reported in A.2d, 1997 WL 441192 (Del.Ch.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1997 WL 441192 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.